**Opinion issued August 21, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00508-CV

———————————

## IN RE UNITED SERVICES AUTOMOBILE ASSOCIATION, Relator

---

## Original Proceeding on Petition for Writ of Mandamus

---

### O P I N I O N

Relator, the United Services Automobile Association ("USAA"), has

petitioned this Court for a writ of mandamus directing the trial court to vacate its

order granting the motion for new trial of the real parties in interest, Mark and

Stacey Bent.[1]  The Bents sued USAA, alleging breach of a homeowner's insurance

---

[1]     The underlying case is *Stacey Bent & Mark Bent v. United Services Automobile Association d/b/a USAA*, cause number 2010-57135, pending in the 164th District Court of Harris County, Texas, the Honorable Alexandra Smoots-Hogan presiding.

policy and violations of the Texas Insurance Code, and a jury awarded the Bents damages in the amount of $400,000. The trial court initially entered judgment on the verdict, but then granted the Bents' motion for new trial. USAA then initiated this proceeding.

After USAA filed its petition, the Supreme Court of Texas decided *In re Toyota Motor Sales, U.S.A., Inc.*, which announced that a trial court's legally appropriate and reasonably specific order granting a new trial may be reviewed on its substantive merits in a mandamus proceeding. 407 S.W.3d 746, 758–59 (Tex. 2013). Applying that standard of review to this case, we hold that none of the trial court's reasons for granting a new trial was proper. Accordingly, we conditionally grant mandamus relief.

## Background

### A. The Bents' insurance policy

In 2005, Mark and Stacey Bent bought a home in the City of Piney Point Village for $1 million. The Bents subsequently made improvements to the home, and on September 5, 2008, an appraiser estimated the home's value at $1.6 million.

The Bents purchased a homeowner's policy from USAA. The homeowner's policy covered losses up to $1.34 million, but excluded losses caused by mold, microorganisms, or operation of ordinances or other law. The policy's "loss

2

payment" provision established a 5-day deadline for payment in certain circumstances:

> If we notify you that we will pay your claim, or part of your claim, we must pay within 5 business days after we notify you. If payment of your claim or part of your claim requires the performance of an act by you, we must pay within 5 business days after the date you perform the act.

But a longer deadline applied to claims resulting from weather or major natural disasters: If a claim resulted "from a weather related catastrophe or a major natural disaster, each claim handling deadline . . . is extended for an additional 15 days."

## B. Hurricane Ike

On September 13, 2008, Hurricane Ike damaged the home's roof and air conditioning units, toppled a number of trees into the Bents' driveway and pool, and damaged the interior of the home. Stacey reported a claim to USAA, and USAA assigned an adjuster to investigate. After visiting the property, the adjuster evaluated the damages at approximately $7,500, which he later revised upwards to $14,302.33. USAA subtracted the Bents' one-percent deductible and mailed the Bents a letter approving their claim. On the same day, USAA issued a check for $1,162.33 and marked the claim closed. According to Stacey, the cost of removing the fallen trees was not included in this initial payment because the adjuster told her that those costs were not covered by the policy.

In December 2008, the Bents obtained a $500,000 home equity loan. At that time, Mark and Stacey both signed a document stating that the home had a fair market value of $1.6 million. Each represented that they had "no knowledge of any condition, proceeding, defect, casualty or any other matter now or potentially existing that would affect the [fair market value]."

## C.  The April 2009 flood

In April 2009, the home suffered further damage from a flood. The Bents held a flood insurance policy issued through USAA General Indemnity Company, an entity related to USAA. Stacey reported the flood claim to USAA. While mitigating the flood damage, workers discovered mold in the walls. Stacey reported the mold to USAA, and USAA's adjusters informed the Bents that mold damage was not covered by their homeowner's policy. The Bents signed a proof of loss stating that the flood caused an estimated $93,288.27 in further damages to the home. The Bents took the position at trial, however, that at least some of the mold was attributable to leaks in the roof caused by the hurricane rather than the flood, and USAA had "missed it" during its original inspection.

After the flood, the Bents discovered additional damage to the roof, not included in USAA's initial damage appraisal, which they attributed to Hurricane Ike and reported to USAA. In May 2009, USAA conducted an inspection at which Stacey and a contractor hired by the Bents were present. USAA found water

damage to the roof and interior of the house beyond that documented in the first inspection after the hurricane, significant hail damage to the roof from a storm two months earlier, and damage from foot traffic. USAA's inspector determined that the shingles used on the roof were no longer available for purchase and therefore recommended a roof replacement instead of a roof repair. At the same time, Stacey and the inspector discussed the cost of removing the trees toppled by the hurricane, and the inspector stated that the homeowner's policy covered the costs of removing trees from the driveway if the Bents could produce proper documentation of the trees' location and cost of removal. Accordingly, in June 2009, USAA revised the total estimate of the damages to the home attributable to Ike, notified the Bents that it would pay an additional amount, and issued a further payment on the same day.[2]

## D. The Bents' pursuit of their insurance claims

In July 2009, after another inspection at which Stacey and a contractor were present, USAA further revised the total estimate of the damages to the home attributable to Ike to $98,079.62. It notified the Bents of this estimate and made a

---

[2] USAA subsequently stopped payment on this check and issued a new one. The original check required signature by USAA Federal Savings Bank, which had issued the Bents a home equity loan. While USAA Federal Savings Bank's signature would be required if the loan was a mortgage, it was not required for a home equity loan. Thus, at the Bents' request, USAA issued a new check listing the Bents as the only payees.

corresponding payment. Also in July 2009, Stacey obtained an estimate of $162,174.85 for the total cost of repairs attributable to Ike or the flood.

In October 2009, the Bents submitted another estimate of additional damages, including items not previously identified during USAA's inspections of the home. Because the estimate was not fully itemized, USAA requested additional information and informed the Bents through a series of phone calls and written correspondence that it could not make further payments until it received additional information.

In November 2009, USAA conducted a further inspection, again with Stacey and a contractor present, at which USAA's inspector explained the additional detail that USAA required. The Bents did not send further information until December 2009, when an attorney acting on their behalf wrote to USAA requesting that it direct all further correspondence to him. USAA corresponded with that attorney until he withdrew from representation of the Bents, then corresponded with the Bents directly and with another attorney throughout late 2009 and the first half of 2010, but received no additional information supporting the Bents' claims under the homeowner's policy.

In December 2009, USAA invoked the appraisal process referenced in the homeowner's policy. The Bents' attorney denied USAA's request to begin the appraisal process, arguing that USAA had breached the homeowner's policy.

## E.     Piney Point Ordinances

After Hurricane Ike struck, Stacey met at least 10 times with Annette Arriaga, the City of Piney Point's director of planning, development, and permits. Arriaga also serves as the secretary for the Planning and Zoning Commission and the Board of Adjustments, which oversees variances to the city's ordinances.

In June 2010, Arriaga sent a letter to the Bents, informing them that the city's estimate of damages to the Bents' home exceeded both 50 percent of the home's value and the amount of $300,000. Repair costs of that magnitude triggered City of Piney Point ordinances requiring that any repairs bring the home in compliance with the city's building codes. To make their home comply with the building codes would have required the Bents to raise the home's foundation. Arriaga wrote that she was "apprehensive about the [overall] health and welfare of the structure," and, "I would recommend that the structure be replaced, re-built."

Arriaga testified that she has no discretion when notifying homeowners of potential code violations, but merely informs them of the relevant ordinances. She and others in her office review repair or improvement estimates provided by homeowners and determine whether the proposed costs exceed the greater of $150,000 or 50% of the value of all improvements on the lot. In the case of the Bents' home, the applicable threshold was $194,535 in 2009 and $150,000 in 2010. Thus, if the Bents had repaired their hurricane damages in late 2008 and

then repaired flood damages in 2009, neither alone would have triggered application of the city's ordinances. Arriaga testified that she informed Stacey that the Bents could seek a variance, but Stacey never asked a contractor to visit Arriaga with her regarding any variances or negotiations with the city, nor did the Bents ever request a variance of the city's ordinances.

## F.    USAA's August 2010 letter

In August 2010, USAA sent a letter to the Bents' attorney. The letter presented a "revised dwelling estimate," which it asked the attorney to "review . . . with Mr. and Mrs. Bent." USAA wrote that it had revised the total estimate of the damages to the home attributable to Ike to $136,539.41. Of that amount, after accounting for depreciation and the Bents' deductible, USAA stated that it was "prepared to send an additional actual cash value payment" in the amount of $27,416.86, which would have brought the total payments made to $89,123.64. The August 2010 letter described the latter amount as the "actual cash value settlement" and stated, "The Loss Settlement Provision stipulates that the loss to your covered property be settled at actual cash value."

According to USAA's claims record and the testimony of its corporate representative, Leesa Tomsett, this amount was not payable until the Bents took action to accept it as a settlement of their claim. Therefore, unlike each of the prior payments, USAA did not issue a check at the time of the August 2010 letter. The

8

Bents did not respond to this letter, but USAA nonetheless issued a check in March 2012, after the Bents had sued, for $27,416.86 plus interest at the rate of 18%.

## G. Foreclosure of the Bents' home

In late 2010, the Bents stopped making their mortgage payments to Wells Fargo. The Bents attempted to accept an offer to sell their home for $910,000, but the deal fell through, and Wells Fargo ultimately foreclosed. The home sold at auction in August 2012 for $655,000.

## H. The underlying suit

The Bents sued USAA for breach of the homeowner's policy, violation of the Texas Insurance Code's requirements regarding prompt payment of claims, and violation of the Insurance Code's prohibition on unfair or deceptive practices.

Before trial, the trial court considered a motion in limine in which the Bents asked the trial court to exclude "[a]ny reference to, or insinuation regarding, [the Bents] not attempting to get a variance from the Piney Point ordinance requiring their house to be brought up to code, or argument or insinuation that they could have, or should have, attempted to get one, or would have received one if they had tried." The trial court heard argument on this motion before granting it in part and denying it in part, ruling that questions about whether the Bents applied for a variance were proper, but that the parties' counsel should approach the bench

before asking questions about whether, had the Bents applied, they would have obtained a variance.

Tomsett, USAA's corporate representative, testified regarding the five-business-day payment requirement and 15-day extension period applicable to weather-related catastrophes. As she explained, both of these requirements are set out both in the homeowner's policy and in the Texas Insurance Code. *See* TEX. INS. CODE ANN. § 542.057(a) ("[I]f an insurer notifies a claimant . . . that the insurer will pay a claim or part of a claim, the insurer shall pay the claim not later than the fifth business day after the date notice is made.") (West 2012); *id.* § 542.059(b) ("In the event of a weather-related catastrophe or major natural disaster, as defined by the commissioner, the claim-handling deadlines imposed under this subchapter are extended for an additional 15 days.").

The Bents also presented the testimony of Richard Daly, one of their attorneys, who testified as to the amount of work that the Bents' attorneys had performed, market rates for such services, and the Bents' contingent-fee agreement in connection with their suit against USAA. Daly opined that the jury should award an amount equivalent to at least 40% of the Bents' recovery as attorney's fees.

A jury found that USAA had not breached the policy in question, but that USAA did make a statement in such a manner as to mislead a reasonably prudent

person to a false conclusion of a material fact. The jury also found that USAA did not knowingly make such a statement. The jury awarded damages in the amounts of $150,000 for the diminished value of the Bents' home and $250,000 for the Bents' mental anguish. The jury also awarded $185,000 in attorney's fees through trial, but awarded zero attorney's fees for any appeals.

The trial court initially decided to enter judgment on the jury's verdict, but later granted the Bents' motion for new trial. The trial court's order identified five reasons for granting the motion for new trial: (1) the jury's finding that USAA did not breach the homeowner's policy was contrary to the great weight and preponderance of the evidence; (2) USAA violated the trial court's order in limine regarding the issue of code variances; (3) the evidence did not support the jury's award for the diminished value of the Bents' home; (4) the jury improperly failed to award appellate attorney's fees; and (5) the parties disputed whether mental anguish damages required a "knowingly" predicate, but failed to argue for such a predicate before the case was submitted to the jury. USAA seeks a writ of mandamus directing the trial court to vacate its new trial order and render judgment on the jury's verdict.

**Mandamus Standard**

Mandamus relief is available only when the trial court has committed a clear abuse of discretion for which there is no adequate remedy by appeal. *In re*

*Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 422 (Tex. 2010) (per curiam) (orig. proceeding). A trial court commits a clear abuse of discretion when its action is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex. 2003) (per curiam) (orig. proceeding). A trial court has no discretion in determining what the law is or in applying the law to the particular facts. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding).

A trial court's order granting a motion for new trial may be reviewed in a mandamus proceeding. *See In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012) (orig. proceeding). Rule 320 of the Texas Rules of Civil Procedure gives trial courts broad discretion in granting new trials, which may be granted for "good cause," or "in the interest of justice." *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 210, 213 (Tex. 2009) (orig. proceeding); TEX. R. CIV. P. 320. "But that discretion is not limitless." *In re Columbia Med. Ctr.*, 290 S.W.3d at 210. "Good cause" exists only if "the error complained of affected the result or might reasonably have so affected the result." *Glasscock v. Bryant*, 185 S.W.2d 595, 600 (Tex. Civ. App.—El Paso 1944, writ ref'd w.o.m.); *see also In re Columbia Med. Ctr.*, 290 S.W.3d at 211–21; *In re City of Houston*, 418 S.W.3d 388, 397 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding); *cf.* TEX. R. APP. P. 44.1(a).

In *United Scaffolding*, the Supreme Court of Texas set out standards for orders granting new trials:

> a trial court does not abuse its discretion so long as its stated reason for granting a new trial (1) is a reason for which a new trial is legally appropriate (such as a well-defined legal standard or a defect that probably resulted in an improper verdict); and (2) is specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reasons from the particular facts and circumstances of the case at hand.

377 S.W.3d at 688–89. The Court suggested examples of invalid orders, such as one based on a reason that is not legally valid, or "if the articulated reasons plainly state that the trial court merely substituted its own judgment for the jury's . . . or that the trial court simply disliked one party's lawyer . . . or that the reason is based on invidious discrimination." *Id.* at 689 (citations omitted). The Court disapproved an order that stated multiple reasons, each of which was preceded by "and/or" and one of which was "in the interest of justice and fairness," leaving the possibility that the latter, legally insufficient, rationale was the only one supporting the order. *Id.* at 689–90. The trial court in that case was required to enter a new order "and elaborate, with reference to the evidence adduced at trial," why the facts of the trial supported one or more of the permissible rationales stated in the new trial order. *Id.* at 690.

After the trial court granted a new trial in this case, and while USAA's mandamus petition was pending in this court, the Supreme Court of Texas issued

its opinion in *In re Toyota Motor Sales*. In *Toyota Motor*, the Court again considered a petition for writ of mandamus arising from a new trial order and resolved the question of "whether an appellate court may, in an original proceeding, determine whether the reasonably specific and legally sound rationale is actually true." 407 S.W.3d at 749. The Court held that when a trial court enters an order for a new trial that facially complies with the requirements of *Columbia Medical Center* and *United Scaffolding*, "an appellate court may conduct a merits-based review of the reasons given . . . ." *Id.* at 762. If the articulated reasons are not supported by the law and the record, mandamus relief is appropriate. *Id.* at 761–62.

The parties to this proceeding devoted significant portions of their briefing to the question of whether this Court may review the new trial order on its merits. *Toyota Motor* has since definitively and affirmatively answered that question. *In re Toyota Motor Sales*, 407 S.W.3d at 761–62; *see also In re Health Care Unlimited, Inc.*, 429 S.W.3d 600, 602 (Tex. 2014) (per curiam) (orig. proceeding); *In re Whataburger Restaurants LP*, 429 S.W.3d 597, 598 (Tex. 2014) (per curiam) (orig. proceeding). Accordingly, we analyze the order granting the Bents' motion for new trial under the standards articulated in *Toyota Motor*, *Columbia Medical Center*, and *United Scaffolding*. If any of the reasons given satisfies all of these

14

standards, then the trial court did not abuse its discretion in ordering a new trial and we will deny relief.

## Grounds for the New Trial Order

### A.     Breach of Contract

The trial court's first basis for granting a new trial is that the jury's failure to find that USAA breached the Bents' homeowner's policy by failing to make timely payments was so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.  Specifically, the trial court quoted the policy's loss payment provision and reasoned,

> Hurricane Ike hit the Texas coast on September 13, 2008.  The testimony of Stacey Bent established that Plaintiffs made an insurance claim within days of that event and that Defendant notified Plaintiffs it would pay Plaintiffs' claim.  Further, the testimony of Stacey Bent and the individual adjusters on the claim established that six different, and increasing, estimates were made by Defendant between the initial estimate on October 6, 2008, and the final estimate on August 28, 2010, and none of Defendant's payments to Plaintiffs were made within the required 5 business days.

> Defendant did not offer any testimony to controvert Plaintiffs' evidence that Defendant failed to make the required payments within 5 business days.

This is a specific reason, satisfying the requirements of *Columbia Medical Center*.  *See In re Columbia Med. Ctr.*, 290 S.W.3d at 213–15.  It is also a legally sound reason, satisfying the requirements of *United Scaffolding*, as a finding that a verdict is contrary to the great weight and preponderance of the evidence can

15

support a new trial order. *See In re United Scaffolding*, 377 S.W.3d at 689 ("an order granting a new trial may amount to a clear abuse of discretion if the given reason, specific or not, is not one for which a new trial is legally valid"); *see also*, *e.g.*, *Sanders v. Harder*, 227 S.W.2d 206, 209–10 (Tex. 1950) ("In ordinary civil cases trial courts . . . may set aside jury verdicts and grant new trials when, in their opinion, those findings, though based upon some evidence, are against the great weight and preponderance of the evidence . . . .").

The question before us is whether the record supports this basis for the new trial order. *In re Toyota Motor Sales*, 407 S.W.3d at 758. In answering this question, a court must defer to the jurors as the sole judges of the credibility of the witnesses, the weight to give their testimony, and the resolution of conflicts in the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 819–21 (Tex. 2005). "Whether a finding is against the great weight and preponderance of the evidence is a factual sufficiency question, and when reviewing factual sufficiency questions, we must consider all the evidence . . . that is, evidence both in support of and contrary to the jury's findings." *Poe v. Hutchins*, 737 S.W.2d 574, 585 (Tex. App.—Dallas 1987, no pet.) (citations omitted). Accordingly, we review all the evidence in a light favorable to the verdict and must assume that the jurors resolved all conflicts in the evidence in accordance with that verdict. *City of Keller*, 168 S.W.3d at 821.

Critically, the loss payment provision in the policy—like the Insurance Code—requires that USAA make a payment within 5 business days of its notifying the Bents that it would pay all or part of their claim or, if payment required additional acts by the Bents, within 5 business days of the date on which they performed such acts.[3] *See* TEX. INS. CODE ANN. § 542.057(a).

The evidence at trial included USAA's claims record for the homeowner's policy. This document, which was admitted without objection, showed that USAA issued checks against the Bents' claim each time USAA approved additional amounts, in October 2008, June 2009, and July 2009. Each of these payments issued on the same date on which USAA notified the Bents that it would pay them, with the exception of the July 2009 payment, which issued the day before USAA notified the Bents that it would pay an additional amount. Although the Bents and USAA hotly contested the appropriate amount and scope of the Bents' homeowner's policy claim, the record contains no evidence that USAA ever notified the Bents that it would pay a claimed amount and then failed to make a timely payment in that amount.

---

[3]     The Bents dispute that the policy allows USAA to make payments within 5 business days after the Bents' acceptance of an offer to settle a claim on mutually agreeable terms. Even if we assume without deciding that an agreement to compromise a claim would trigger the loss payment provision, that provision plainly states that USAA's deadline in such a scenario would not be triggered until the Bents took any required actions. Accordingly, we reject this argument.

As for the August 2010 letter, the evidence at trial was inconclusive regarding whether the letter constituted a notification that USAA would pay a claim or an attempt to settle the claim for an agreed amount. The claims record also reflects the letter but, unlike the payments made in 2008 and 2009, does not include notations that USAA had agreed to pay an additional amount against the claim or had notified the Bents that it would do so.

The evidence was also inconclusive as to whether the Bents were required to take additional actions before USAA was obligated to make any payments under the August 2010 letter. The claims log reflects that "additional payment is pending attorney's approval or agreed price based on revised estimate of 8/27/2010." The letter itself is ambiguous, stating only that the Bents' attorney should "review the revised estimate with Mr. and Mrs. Bent," and that USAA was "prepared to send an additional actual cash value payment based on the enclosed estimate." This is not an unequivocal statement that USAA would pay the Bents' claim in the amount of the revised estimate. By contrast, USAA sent a letter at the same time as the October 2008 payment, stating, "We've issued payment separately for the following claim."

Tomsett testified that the August 2010 letter was an attempt at a "compromised settlement," not an unconditional agreement to pay an additional amount on the claim, and that USAA was waiting for the Bents to accept the offer

18

before making such a payment. Further, USAA's last written responses to the Bents' claim had denied additional payment pending the Bents' submission of additional support. In March 2012, however, USAA paid the amount set out in the August 2010 letter, stating, "[G]iven that USAA determined that a supplemental payment of $27,416.86 was due the Bents, USAA is at this time enclosing a check in the amount of $35,214.21, which represents the aforementioned principal sum of $27,416.86 plus interest on this amount at the rate of 18 percent for 19 months through March 2012."

Thus, the evidence conflicted as to both the nature of the August 2010 letter and the Bents' obligations, if any, in responding to it. It is undisputed, however, that neither the Bents nor their attorney ever responded to the August 2010 letter accepting USAA's offer or requesting issuance of the additional payment. A rational juror could have credited Tomsett's testimony and believed that the August 2010 letter reflected only an offer with an unsatisfied condition precedent and determined that the loss payment provision did not require payment of the $27,416.86 within either 5 days or the extended 20-day period after USAA sent the letter. *City of Keller*, 168 S.W.3d at 821 (resolution of conflicting evidence and conflicting but rational inferences from undisputed evidence are province of jury).

The trial court found that "none of [USAA's] payments to [the Bents] were made within the required 5 business days," but this finding lacks support, and a

19

rational juror could find that USAA did not breach the homeowner's policy. *See id.* Although the trial court's order states that it has "detailed the relevant evidence regarding [USAA's] breach of the policy-at-issue," it does not actually identify any evidence tending to show that USAA did not comply with the loss payment provision of the policy. The trial court's further statement that USAA "did not offer any testimony to controvert [the Bents'] evidence that USAA failed to make the required payments within 5 business days" is incorrect, as USAA offered such evidence in the form of the claims log and Tomsett's testimony regarding the log, the timing of payments, and the August 2010 letter.

Nonetheless, the trial court disregarded the jury's finding that no breach occurred and incorrectly concluded, "USAA breached the insurance agreement as a matter of law." To the extent that the trial court granted the Bents a new trial on the basis that the jury incorrectly failed to find a breach of the policy, it abused its discretion. *See In re Toyota Motor Sales*, 407 S.W.3d at 761.

## B. Variance

The second basis for the new trial order was that USAA violated the trial court's order in limine by discussing, during closing argument, whether the Bents applied for a variance from the City of Piney Point in order to avoid having to demolish their home. The trial court's order was based on the Bents' motion to exclude any implication that the Bents could have or should have applied for or

received a variance.  During argument on the motion, the following exchange took place:

> USAA'S COUNSEL:  I mean, I think it's absolutely relevant to ask whether or not they got a variance or requested a variance.  I think that is absolutely within—
>
> THE COURT:  I don't have a problem with that.  I think—
>
> USAA'S COUNSEL:  As far as the routine activities of the board—I think that's something that we could approach the bench with at the time, and if Ms. Arriaga is prepared or qualified to answer that, then we can proceed in that regard.
>
> THE COURT:  Yeah.  I'm not going to limine out the entire issue of a variance, but whether or not they would've, all that those kind of questions, you're going to have to talk to me about
>
> USAA'S COUNSEL:  Absolutely.
>
> THE COURT:  —before you come up.  So sort of granted in part and denied in part.

In granting the Bents' motion for new trial, the trial court reasoned that testimony about what the City of Piney Point would have done if the Bents had applied for a variance was inadmissible speculation.  The court stated, "USAA['s] counsel raised the variance subject with City of Piney [Point] official, Annette Arriaga, in an attempt to suggest that Plaintiffs could have, or would have, gotten a variance if they had applied for one."  It continued, "Plaintiffs' counsel objected and the Court sustained the objection."

The new trial order then quotes USAA's closing argument, in which USAA (1) pointed out that the Bents never sought a variance, (2) reminded the jury that

Arriaga testified that the City of Piney Point gives variances for flood damage and other natural disasters, and (3) argued that the jury could infer, based on that evidence, that the Bents could have obtained a variance. The trial court concluded that USAA's argument was unsupported by the evidence at trial. USAA also argued that the Bents had failed to provide their contractors' estimates to USAA and never informed USAA of the Bents' interactions with the City of Piney Point so that USAA could seek a variance on the Bents' behalf. The trial court found that this argument violated its order in limine.

The Bents' counsel did not object to USAA's closing argument or to any part of USAA's examination of Arriaga about variances. Nonetheless, the trial court found that "USAA's jury argument on the issue of variance was improper" and that it "materially prejudiced Plaintiffs, and therefore, there is good cause to order a new trial."

The trial court's reasoning is specific and thus satisfies the requirements of *Columbia Medical Center*. *See In re Columbia Med. Ctr.*, 290 S.W.3d at 213–15. Further, the violation of an order in limine can serve as the basis for a new trial order. *See*, *e.g.*, *In re City of Houston*, 418 S.W.3d at 397. Thus, this reasoning satisfies the requirements of *United Scaffolding*. *In re United Scaffolding*, 377 S.W.3d at 689. We therefore must consider whether the record supports this basis for the new trial order. *See In re Toyota Motor Sales*, 407 S.W.3d at 758.

As a threshold matter, we note that the record reflects that the trial court granted this motion only in part and denied it in part. Specifically, the trial court stated that it did not "have a problem with" questions regarding whether the Bents obtained or requested a variance, but granted the Bents' motion with respect to questions about whether the Bents would have obtained a variance if they had applied for one.

The new trial order implies that USAA violated the trial court's order in limine during its questioning of Annette Arriaga regarding variances in an "attempt to suggest that Plaintiffs could have, or would have, gotten a variance if they had applied for one." USAA did not ask Arriaga whether the Bents would have obtained a variance if they had applied. Rather, it asked only whether residents of Piney Point can request variances, whether Arriaga educated the Bents regarding this fact, whether Stacey ever requested a variance, and what factors the Board of Adjustments considers when deciding whether to approve a variance.[4] And contrary to the trial court's order, the Bents did not object to any portion of Arriaga's testimony regarding variances, and the trial court did not sustain any such objection. By failing to object, the Bents waived any error in the admission

---

[4] We note that this questioning occurred immediately after the Bents' counsel asked Arriaga to engage in precisely the kind of speculation that the Bents claim was prohibited by the order in limine. Specifically, the Bents' counsel asked Arriaga whether, if the Bents had presented the city with certain damage estimates, a building permit "would . . . have been approved."

of this testimony. *See In re Toyota Motor Sales*, 407 S.W.3d at 760; *Bay Area Healthcare Gp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007) ("Error is waived if the complaining party allows the evidence to be introduced without objection."); *State Bar of Tex. v. Evans*, 774 S.W.2d 656, 659 n.6 (Tex. 1989) ("Failure to request the court to instruct the jury to disregard the inadmissible testimony results in waiver of the alleged error where the instruction would have cured the error."). To the extent that the trial court purportedly based its new trial order on a sustained objection to Arriaga's testimony regarding variances, the order is unsupported by the record.

Nor did USAA's closing argument provide grounds for granting a new trial. USAA's counsel did not argue that Arriaga had testified that the Bents would have received a variance; he merely recalled her testimony that the Bents did not apply for a variance, and that the Board of Adjustments grants variances for unnecessary hardships, specifically including floods. The trial court's order in limine did not prohibit questions on such topics or argument based on the same. And "[o]nce the evidence was in the record—without objection or a request that it be stricken or that the jury be instructed to disregard—it was in for all purposes and a proper subject of closing argument." *In re Toyota Motor Sales*, 407 S.W.3d at 760. Further, the Bents did not object during closing argument.

24

The Bents argue that no objection was necessary, because objections are only required to preserve error for appellate review, not for purposes of trial court proceedings such as an order for a new trial or imposition of sanctions. As support, the Bents cite *Weidner v. Sanchez*, 14 S.W.3d 353 (Tex. App.—Houston [14th Dist.] 2000, no pet.). In *Weidner*, our sister court considered repeated violations of an order in limine, to which the appellants objected inconsistently and which the trial court cured by instructing the jury to disregard certain testimony. 14 S.W.3d at 364–65. The court thus concluded that any prejudice resulting from the violations to which the appellants did object was cured by the court's instruction to disregard. *Id.* at 365. By contrast, the Bents never objected to any of USAA's purported violations of the order in limine, and USAA's questions and argument did not, in fact, violate the order or otherwise improperly prejudice the Bents. *Weidner* thus has no bearing on this case.

In summary, the trial court's order in limine did not prohibit USAA's questions to Arriaga regarding variances, nor did it prohibit jury argument regarding her testimony. *See In re Toyota Motor Sales*, 407 S.W.3d at 760. To the extent that the trial court granted a new trial based on USAA's purported violations of the order in limine or improper closing argument, the record does not support that order.

25

## C. Damages for Diminished Value of the House

The third ground for a new trial identified by the trial court is that the $150,000 that the jury awarded for the diminished value of the Bents' home was unsupported by the evidence and "seems arbitrary." The trial court observed that both sides contended that the evidence did not support the award. USAA urged the trial court to disregard the figure and award zero damages for diminished value, while the Bents argued that the jury should have awarded at least $900,000. The trial court reasoned,

> The Court agrees that the $150,000.00 damage award seems arbitrary, given the evidence that was presented. But the Court is not inclined to substitute its opinion for that of the jury. Texas Rule of Civil Procedure 320 specifically provides that "new trials may be granted when the damages are manifestly too small or too large." The Court believes that the damages awarded by the jury for diminished value of Plaintiffs' home was not supported by the evidence at trial. Thus the Court finds good cause for a new trial.

USAA argues that this reason lacks the specificity required by *Columbia Medical Center*. We disagree. *Columbia Medical Center* merely requires that the trial court's reasons for granting a new trial "be clearly identified and reasonably specific." *In re Columbia Med. Ctr.*, 290 S.W.3d at 215. The trial court's third reason is specific enough both to permit USAA to attack it and to enable our review of it.

USAA also argues that the third basis for the order fails under *United Scaffolding* because it is not a reason for which a new trial is legally appropriate.

26

On its face, the order states that the damages awarded for the diminished value of the home are not supported by the evidence. It does not, however, "elaborate, *with reference to the evidence adduced at trial, how* the jury's answers are contrary to the great weight and preponderance of the evidence," as required by *United Scaffolding*. *In re United Scaffolding*, 377 S.W.3d at 690 (emphasis added). That is, it discusses the parties' arguments as to what the evidence showed, but the order does not actually discuss the evidence itself. We conclude that the order does not satisfy the requirements of *United Scaffolding* because USAA cannot determine upon which evidence the trial court relied in granting a new trial.

Even if the order satisfied *United Scaffolding*, we would hold that the order was improper because the verdict was not against the great weight and preponderance of the evidence. *See id.* at 689; *Sanders*, 227 S.W.2d at 209–10; *Poe*, 737 S.W.2d at 585. The verdict form asked the jury whether USAA engaged in unfair or deceptive acts or practices and, if so, the "diminished value of the Bents' home" due to such acts or practices. Such a question goes to the fair market value of the home. *See*, *e.g.*, *Mieth v. Ranchquest, Inc.*, 177 S.W.3d 296, 303–04 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Brighton Homes, Inc. v. McAdams*, 737 S.W.2d 340, 342 (Tex. App.—Houston [14th Dist.] 1987, writ denied); *Precision Homes, Inc. v. Cooper*, 671 S.W.2d 924, 928 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Under Texas law, "fair market value" is

27

defined as "the price property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it." *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981); *see also Jabri v. Alsayyed*, 145 S.W.3d 660, 667 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

When the evidence presented at trial supports a range of damages, the jury has discretion to award damages within that range, "so long as a rational basis exists for the jury's calculation." *Swank v. Sverdlin*, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *Mayberry v. Tex. Dept. of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied); *cf.*, *e.g.*, *First State Bank v. Keilman*, 851 S.W.2d 914, 930–31 (Tex. App.—Austin 1993, writ denied) (jury may not "pull figures out of a hat" and thus is constrained when both parties present "relatively precise method" for calculating exact amounts of unauthorized interest such that no rational basis exists for intermediate award between figures presented).

The Bents adduced evidence at trial that the market value of the home just before Hurricane Ike's arrival in Houston was $1.6 million. USAA adduced further evidence that, after Ike hit, Mark and Stacey represented in a December 2008 "Acknowledgment of Fair Market Value" that the home's fair market value was $1.6 million at that time.

28

On the other hand, USAA adduced evidence that the Bents received two offers to purchase their home in early 2011, one for $875,000 and one "as is" offer for $910,000. These data points established a potential range of diminished value damages from zero to at least $725,000—the difference between the lowest offer and $1.6 million. Further, the many estimates of the cost to repair the damage to the home at various points after the hurricane spanned a range from $14,000 to more than $300,000. Such estimates can be the basis of a diminished value award when the property can be repaired. *See*, *e.g.*, *Celanese Ltd. v. Chem. Waste Mgmt., Inc.*, 75 S.W.3d 593, 599 (Tex. App.—Texarkana 2002, pet. denied) ("Where an injured party chooses to repair damaged items, evidence of the cost of repair is both relevant and material and provides support, not for an alternative measure of damages, but for proof of the difference in fair market value."); *Weaver Constr. Co. v. Rapier*, 448 S.W.2d 702, 707 (Tex. App.—Dallas 1969, no writ) (when home was flooded but susceptible to repair, "the rule [is] that if a house can be repaired so that it is in as good condition as before the injury, the measure of damages is limited to the reasonable and necessary cost of repairs."). Because the jury's award of $150,000 falls in the range established by the evidence at trial, it was not against the great weight and preponderance of the evidence.

We hold that the trial court abused its discretion to the extent that it ordered a new trial on the basis that the jury's award of diminished value damages was arbitrary or unsupported by the evidence.

## D. Attorney's Fees

The trial court found, as a fourth reason for granting a new trial, that the jury's award of zero appellate attorney's fees was against the great weight of the evidence and that an award of fees was mandatory. The trial court reasoned that Chapter 38 of the Texas Civil Practice and Remedies Code and Chapters 541 and 542 of the Texas Insurance Code mandate awards of attorney's fees when a plaintiff prevails on a breach of contract claim or Insurance Code claim, respectively. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 38.001–.003 (West 2012); TEX. INS. CODE ANN. §§ 541.152(a)(1), 542.60(a). The trial court then reasoned that, "when a statute mandates an award of trial attorney's fees, an award of appellate attorney's fees is likewise mandatory," citing *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 198–99 (Tex. App.—Fort Worth 2012, no pet.) and *Ogden v. Ryals*, No. 14-10-01052-CV, 2012 WL 3016856, at *5 (Tex. App.—Houston [14th Dist.] July 24, 2012, no pet.). It continued,

> Since Plaintiffs prevailed on their [Insurance Code Chapter] 541 claims, they were entitled to an award of attorney's fees for trial and through appeal. Moreover, as was mentioned above, the Court finds that USAA breached the insurance agreement as a matter of law. The jury answered "no" to the breach of contract question. Thus, it is unclear how that answer affected the total attorney's fees awarded by

30

the jury ($185,000). That number may very well have been higher had the jury properly answered the breach of contract question. In any event, the jury could not legitimately award $0.00 for Plaintiffs' attorney's fees on appeal. Thus, the Court finds good cause for a new trial.

This portion of the order is sufficiently specific. *See In re Columbia Med. Ctr.*, 290 S.W.3d at 213–15. For the reasons that we have already discussed, however, the trial court abused its discretion in finding that USAA breached the Bents' homeowner's policy as a matter of law. The trial court thus abused its discretion in finding that the jury was required to award attorney's fees for the Bents' breach of contract claim. *See In re United Scaffolding*, 377 S.W.3d at 689.

Likewise, the trial court abused its discretion in granting a new trial based on the jury's failure to award appellate fees under the Insurance Code. A plaintiff who prevails on claims under Subchapter D of Chapter 541 of the Texas Insurance Code may recover "reasonable and necessary attorney's fees." TEX. INS. CODE ANN. § 541.152(a)(1). Similarly, when an insurer is liable under an insurance policy and does not comply with the prompt payment requirements in Chapter 542 of the Insurance Code, the insurer is liable for "reasonable attorney's fees." *Id.* § 542.060(a). Here, however, the Bents were not entitled to recover fees under Chapter 542 because the jury made no finding that USAA failed to make prompt payment of claims. *See id.* § 542.060; *see generally id.* §§ 542.051–.061 (Subchapter B).

31

By contrast, the jury did find for the Bents on one claim under Chapter 541 of the Insurance Code. But the Bents bore the burden to demonstrate the reasonable and necessary amount of their attorney's fees, for both the trial and appellate levels. *E.g.*, *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997); *Ogden v. Ryals*, 2012 WL 3016856, at *5. This burden must be met even if an award of fees is mandated by statute. *E.g.*, *Rosenblatt v. Freedom Life Ins. Co. of Am.*, 240 S.W.3d 315, 320 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (upholding jury verdict awarding zero attorney's fees despite finding for plaintiff on Insurance Code violation); *Cain v. Pruett*, 938 S.W.2d 152, 160 (Tex. App.—Dallas 1996, no writ) (reversing judgment notwithstanding verdict and entering judgment on jury's verdict where jury awarded trial attorney's fees but no appellate fees).

The Bents' fees expert, Daly, testified that, in a contingent fee contract, his fee is "set" and "typically" would not change based on the amount of time that he spent on the case. He explained, "A lot of times it'll go up . . . if there's an appeal . . . and after a final judgment, but for the most part it's the same." He testified that he and other lawyers on the case had spent approximately 1,500 hours on the case, but that this estimate did not include any "additional expense and time for going up to the Court of Appeals or the Supreme Court, if the case happens that way, after this trial." He then testified regarding the "appropriate amount of

money for the cost of appeal and the cost to the Supreme Court," which he identified as $200,000 and $100,000, respectively. He acknowledged that the jury was required to "put a number in there [and] can't put a percentage," but continued to emphasize that, "[i]f you work on a contingency basis, 40 percent is the customary fee."

This case is similar to *Rosenblatt v. Freedom Life Insurance Co. of America*, 240 S.W.3d 315 (Tex. App.—Houston [1st Dist.] 2007, no pet.). In that case, a jury found that an insurer violated the predecessor statute to Chapter 541, but awarded no attorney's fees. 240 S.W.3d at 317, 320; *see also* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (repealing former Article 21.21 of Insurance Code). While the Insurance Code mandated an award of fees to a prevailing plaintiff, "the party seeking attorney's fees [must] establish that the fees sought are both 'reasonable and necessary.'" *Rosenblatt*, 240 S.W.3d at 320. Thus, we held in *Rosenblatt* that the jury was authorized to disregard the testimony of an interested witness regarding attorney's fees who contradicted and controverted her own testimony, and the trial court erred in disregarding the jury's award of zero fees. *Id.* at 324.

The court of appeals in Dallas reached a similar conclusion in *Cain v. Pruett*, 938 S.W.2d 152 (Tex. App.—Dallas 1996, no writ). There, the jury awarded attorney's fees through trial on a Texas Deceptive Trade Practices Act claim, but

awarded no appellate fees. *Id.* at 156. The trial court nonetheless awarded appellate fees in its judgment. *Id.* at 159–60. But as the court of appeals explained, "the jury heard evidence that [the plaintiffs'] attorneys were working on a contingency fee," and thus "could find that an appeal . . . would be part of the services for which [they] agreed to accept a percentage of the final judgment." *Id.* at 160. Accordingly, the appellate court reversed the trial court and entered judgment on the jury's verdict of zero appellate attorney's fees. *Id.*

Daly testified repeatedly that the Bents and their attorneys had agreed to a 40% contingency fee. Daly never testified that a particular amount of fees was reasonable or necessary for an appeal. While he testified regarding the potential *cost* of an appeal, he continued to emphasize that the Bents' attorney's fees were contingent on the amount recovered at trial. In light of these facts, the jury could have found that any appeals were part of the work for which the Bents' attorneys had agreed to accept a contingent fee. *See id.*

The Bents did not meet their burden to show that they were entitled to additional attorney's fees for appeals to this Court or a higher court. To the extent that the trial court based its order on the Bents' motion for new trial on the jury's award of zero appellate attorney's fees, it abused its discretion. *See In re United Scaffolding*, 377 S.W.3d at 688–89.

**E.      Mental Anguish Damages**

As a fifth reason for granting a new trial, the trial court found that the jury verdict as to mental anguish damages was not supported by a finding that USAA "knowingly" made a statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact.  The trial court concluded that both sides' failure to argue for a "knowingly" predicate constituted good cause for ordering a new trial.

This is a specific reason, satisfying *Columbia Medical Center*.  *In re Columbia Med. Ctr.*, 290 S.W.3d at 213–15.  But, for two reasons, it is not a legally valid basis for granting a new trial.  *See In re United Scaffolding*, 377 S.W.3d at 689.

First, the premise is incorrect.  Question 4 in the jury charge asked, "Did USAA engage in any unfair or deceptive act or practice that caused damages to Mark and Stacey Bent?"  The last subpart of Question 4 asked whether USAA made "any statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact."  USAA argued in its written submission of a proposed charge and during both the informal and formal jury charge conferences that an affirmative answer to Question 4 would require a finding that USAA "knowingly" engaged in the conduct described therein before mental

anguish damages could be awarded, but the trial court refused to submit the question and accompanying instructions in the form submitted by USAA.

Second, the trial court actually submitted the "knowingly" mens rea in Question 6, with explicit reference to any unfair or deceptive acts found by the jury in response to Question 4. Question 6 asked, "Did USAA *knowingly* engage in an unfair or deceptive act or practice as found by you in answer to Question 4?" (emphasis in original). The jury answered Question 6 in the negative. There is no reason that the trial court could not have applied the jury's negative answer to that question to the jury's award of mental anguish damages in Question 5.

Because the jury found that USAA did not knowingly engage in an unfair or deceptive act or practice, the trial court abused its discretion in granting a new trial on the basis that the parties failed to argue for a "knowingly" predicate to the mental anguish award. *See In re Toyota Motor Sales*, 407 S.W.3d at 758.

## F.  Aggregate Grounds for New Trial

The trial court found that each of the five reasons for its order constituted good cause for a new trial, both individually and "when viewed in aggregate." None of the trial court's five stated reasons for granting a new trial is legally appropriate and grounded in the facts of the case. We hold that those reasons, whether taken individually or together, do not constitute a legally and factually

valid justification for a new trial.  *See* TEX. R. CIV. P. 320; *Glasscock v. Bryant*, 185 S.W.2d at 600.

**Nature of the Requested Relief**

USAA asks that we direct the trial court both to withdraw its new trial order and to enter judgment on the jury's verdict.  *See In re Toyota Motor Sales*, 407 S.W.3d at 762; *In re City of Houston*, 418 S.W.3d at 388.  Such relief may not always be appropriate, as when the trial court's reasons for granting a new trial are unclear or ambiguous.  *See In re City of Houston*, 418 S.W.3d at 398.  Here, however, the trial court's reasons are clear but invalid.  In this circumstance, ordering the trial court to enter judgment on the verdict is proper.  *Id.* at 398–99 (granting writ of mandamus where trial court improperly granted motion for new trial and ordering entry of judgment on verdict); *see also In re Toyota Motor Sales*, 407 S.W.3d at 762 (same); *In re Health Care Unlimited, Inc.*, 2014 WL 1661434, at *3 (same); *In re Whataburger Restaurants LP*, 2014 WL 1661349, at *1 (same); *In re Baker*, 420 S.W.3d 397, 405 (Tex. App.—Texarkana 2014, orig. proceeding) (same).

**Conclusion**

We conditionally grant USAA's petition for writ of mandamus.  We order the trial court to vacate its order granting the Bents' motion for new trial and enter

judgment on the jury's verdict.  We are confident that the trial court will comply, and the writ will issue only if it does not.

Rebeca Huddle
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.