**Opinion issued June 30, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00375-CV

———————————

**LOST CREEK VENTURES, LLC D/B/A HAPPY BULLDOG
MANAGEMENT; STEPHAN EPSTEIN; AND MARILYN ROTH EPSTEIN,**
**Appellants**

**V.**

**ALAN PILGRIM, Appellee**

**On Appeal from the County Court at Law No. 2**
**Travis County, Texas\***
**Trial Court Case No. C-1-CV-12-007660**

---

\*      The Supreme Court of Texas transferred this appeal from the Court of Appeals
       for the Third District of Texas. *See* TEX. GOV'T CODE § 73.001 (authorizing
       transfer of cases). We are unaware of any conflict between precedent of the
       Court of Appeals for the Third District and that of this Court on any relevant
       issue. *See* TEX. R. APP. P. 41.3.

## MEMORANDUM OPINION

In this landlord-tenant dispute, Alan Pilgrim obtained a judgment against Marilyn and Stephan Epstein and their property management company, Lost Creek Ventures, LLC, doing business as Happy Bulldog Management. The trial court found that the Epsteins and Happy Bulldog breached their residential lease agreement with Pilgrim and violated provisions of the Texas Property Code. On appeal, the Epsteins and Happy Bulldog contend that the trial court (1) based its findings on insufficient evidence and failed to offset the amount of the judgment for damage to the premises; (2) erred in awarding attorney's fees; (3) erred in admitting photographs into evidence; (4) erred in imposing joint and several liability; (5) erred in refusing to disqualify Pilgrim's counsel; and (6) erred in denying motions for continuance and for a new trial.

We modify the trial court's judgment to provide that Marilyn and Stephan Epstein are not individually liable for the $118.82 in damages awarded to Pilgrim for breach of the lease; we affirm the judgment as modified.

## BACKGROUND

In May 2010, Pilgrim executed a residential real estate lease agreement with Happy Bulldog Management for a one-year lease of a three-bedroom duplex on Cuernavaca Street in Austin, Texas, for a monthly rental of $1,195 and a security deposit of one month's rent plus $250. The duplex shared a common laundry area

with another duplex. The Epsteins own Happy Bulldog through Lost Creek Ventures, their limited liability company. They also own the duplex rented to Pilgrim.

The lease required that Happy Bulldog reimburse Pilgrim for expenses that Pilgrim incurred in painting the duplex and that Happy Bulldog replace damaged exterior window screens in connection with the rental. Despite presentation of the receipts, Happy Bulldog refused to reimburse Pilgrim for painting the unit, nor did it replace the windscreens. In addition, the unit was infested with rodents, particularly in the laundry room, and Happy Bulldog's attempt to remedy the problem failed. Finally, the driveway was in poor condition, and Happy Bulldog's attempt to remedy the problem with sand and gravel failed after rain washed the sand and gravel away.

In September, Pilgrim terminated the lease and vacated the property. When the Epsteins notified Pilgrim that they would withhold his security deposit unless he settled their dispute by accepting only a portion of his security deposit, Pilgrim sued the Epsteins and Happy Bulldog Management in small claims court, alleging they had breached the lease, failed to make repairs that affected his health and safety, and wrongfully failed to refund his security deposit. He also requested that he be awarded his attorney's fees.

The Epsteins contended that they were not proper parties to the suit, as they did not sign the lease in their individual capacities. Happy Bulldog counterclaimed for breach of the lease, alleging that Pilgrim had wrongfully terminated it and had damaged the leased property's driveway when he had attempted repairs. Pilgrim failed to appear for trial in the small claims court. It subsequently entered a judgment in favor of Happy Bulldog Management, and it dismissed the Epsteins from the suit on the basis that they were not proper parties.

Pilgrim appealed de novo to the county court at law. In the county court, he filed an amended petition, adding allegations that Happy Bulldog and the Epsteins violated the landlord-tenant statute by refusing in bad faith to return his security deposit or provide an accounting of deductions made from it. In addition to damages, Pilgrim again requested attorney's fees.

The case was tried to the bench. The trial testimony primarily consisted of the parties' conflicting accounts of Pilgrim's repair requests and the Epsteins' responses. Both sides' attorneys also testified regarding their fees.

Pilgrim testified that the lease required the lessor to repair any condition affecting his health or safety and repair or replace some screens, but the Epsteins did not repair or replace the screens. He also testified that he requested that they have the premises treated by an exterminator after he discovered rat droppings in the water heater closet in the back bedroom. He described that area as "inundated with rat

4

feces." He noted that there was an associated odor problem. He could not use the duplex's common laundry area "because the smell of rat urine and feces" was "so strong," and there was "a stench inside the house" that caused his clothes to smell. He also could not use a storage area, because it made "everything smell that's stored in there." Pilgrim testified that Marilyn Epstein told him that the property had been sprayed and disinfected, but he stated that he was still smelling "odors from raccoons and rats" afterward. Pilgrim had two contractors out to the property to assess the odor issue. One of these contractors provided an itemized estimate of $2,499 to remedy the situation in late July 2010, and Pilgrim provided this estimate to the Epsteins. He testified that he repeatedly raised these issues with the Epsteins, but that they failed to resolve them. In late August 2010, he sent the Epsteins a letter stating that he would terminate the lease if they did not promptly remedy these issues. They failed to do so, and Pilgrim terminated the lease.

Marilyn was the principal witness on behalf of the defense. She testified that she and Stephan owned the leased premises and that Happy Bulldog Management was the name under which their property management company, Lost Creek Ventures, operated. The Epsteins are the sole members of this limited liability company. Marilyn testified that some of the screens were repaired or replaced in June 2010, but that this project was not completed due to Pilgrim's "continuous barrage of requests for very expensive items." She said that Pilgrim told her to

concentrate on his other requests instead of the screens and also that he impeded repair or replacement of the screens by obstructing access to the premises with a sawhorse and sign he placed in the driveway that complained of the Epsteins' alleged refusal to repair the driveway. Marilyn testified that the Epsteins sent a pest control service to the property in late May 2010. Snap traps were put in place as part of this treatment, and the same pest control service came back to the property to retrieve the dead rats. She claimed that the service specifically addressed the living areas that Pilgrim complained about as well, and she claimed that the rodent problem had been remedied before Pilgrim terminated the lease.

After Pilgrim moved out, the Epsteins sent him a letter regarding his security deposit. In this letter, Stephan stated that Pilgrim had incurred charges in the following amounts: $1,489 for repairs to the walls and repainting; $325 for pest control; $130 for clean-up costs; and $600 for two weeks' rent. Even allowing Pilgrim a credit of $350 for painting costs he incurred when he moved in, the charges and damages Pilgrim owed exceeded the amount of his security deposit. Stephan Epstein nonetheless enclosed a check for $600. By way of explanation, he wrote: "We have discounted charges dramatically and issued the enclosed refund of deposit balance check in the amount of $600. Cashing this check is acknowledgment of receipt in full of all deposit money owed, and settlement of any deposit and rent issues in full by you." Pilgrim returned the check.

When asked how the Epsteins arrived at the $600 figure, Marilyn testified that it "was basically something that I thought would reasonably just settle this for him to go and go on his way." When asked about the $1,489 damage figure, she testified that it would cost this much to repair some bolt holes in the wall and repaint. Marilyn testified that she "figured it would cost us [that amount to] repair it" based on her experience. She agreed that the Epsteins did not deduct the charges and damages stated in Stephan's letter from Pilgrim's deposit, but rather that these figures were an indication of what they thought they could deduct under the circumstances. According to Marilyn, the point of the charges and damages stated in the letter to Pilgrim was to show him that the Epsteins were "being gracious" and giving him more than they were obligated to refund.

The county court rendered judgment for Pilgrim. It found that the Epsteins and Happy Bulldog:

- breached the lease, by failing to repair or replace the screens;

- violated the landlord-tenant statute by failing to make a diligent effort to repair a condition materially affecting Pilgrim's health and safety and that Pilgrim properly terminated the lease based on this violation; and

- withheld Pilgrim's entire security deposit in bad faith.

It also found in Pilgrim's favor with respect to the breach of contract claims asserted by the Epsteins and their management company regarding Pilgrim's early termination of the lease and alleged damage to the premises.

The Epsteins and Happy Bulldog moved for a new trial and for a continuance of the hearing on their motion. The county court denied both motions.

## DISCUSSION

### I.  Sufficiency of the Evidence

The Epsteins contend that the evidence is legally and factually insufficient to support the county court's findings that they breached the lease by failing to repair window screens; Pilgrim was justified in terminating the lease; and they retained Pilgrim's security deposit in bad faith. They also contend that the court failed to offset the amount awarded to Pilgrim for property damage and stolen building materials.

### A.     Standard of Review

To challenge the legal sufficiency of the evidence, the appealing party must demonstrate a complete lack of evidence regarding the disputed issue, or that the court is barred by rules of law or evidence from crediting the only evidence offered on the subject, or that the evidence conclusively proves the opposite to be true. *Dallas Nat'l Ins. Co. v. De La Cruz*, 470 S.W.3d 56, 57 (Tex. 2015) (per curiam); *C.C. Carlton Induss., Ltd. v. Blanchard*, 311 S.W.3d 654, 659 (Tex. App.—Austin 2010, no pet.).

When reviewing the evidence for factual sufficiency, we consider all of the relevant evidence in the record. *See In re S.M.R.*, 434 S.W.3d 576, 586 (Tex. 2014).

8

We examine both the proof supporting and contradicting the findings in a neutral light. *City of Austin v. Chandler*, 428 S.W.3d 398, 407 (Tex. App.—Austin 2014, no pet.). We defer to the fact finder's "implicit determinations of credibility and weight to be given to the evidence." *Id.* When a party challenges the factual sufficiency of an adverse finding on which it had the burden of proof, it must show "that the adverse finding is against the great weight and preponderance of the evidence." *Id.* at 407–08.

## B. Landlord-Tenant Law

Leases are contracts and are governed by the rules that apply to contracts generally. *Ferrari v. Bauerle*, 519 S.W.2d 144, 146 (Tex. App.—Austin 1975, writ ref'd n.r.e.). Chapter 92 of the Texas Property Code further governs residential leases. Subject to notice requirements, Chapter 92 permits a residential tenant to terminate a lease if a landlord does not make a diligent effort to repair or remedy a condition that materially affects an ordinary tenant's health or safety. TEX. PROP. CODE ANN. § 92.056(b), (e)(1) (West Supp. 2015). A tenant who does so is entitled to one month's rent, plus $500 as a civil penalty, court costs, and attorney's fees. TEX. PROP. CODE. ANN. § 92.0563(a)(3), (5) (West 2014).

Once a tenant surrenders the premises, the landlord is obligated to refund any security deposit. *Id.* § 92.103(a). The landlord may deduct charges and damages for which a tenant is legally liable under the lease, excluding normal wear and tear, or

9

any damages that result from breach of the lease. *Id.* § 92.104(a)–(b). But the landlord must return the remainder of the deposit along with "a written description and itemized list of all deductions" *Id.* § 92.104(c). These statutory obligations with respect to security deposits are mandatory. *See* TEX. PROP. CODE ANN. § 92.006(a) (West Supp. 2015) (providing that a "landlord's duty or a tenant's remedy concerning security deposits" may not be waived); *Hardy v. 11702 Mem'l, Ltd.*, 176 S.W.3d 266, 275 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (applying plain language of Section 92.104).

If a landlord retains the security deposit in bad faith, it is liable to the tenant for $100, three times the portion wrongfully withheld, and reasonable attorney's fees. TEX. PROP. CODE ANN. § 92.109(a) (West 2014). If a landlord in bad faith does not provide a written description and itemized list of the damages and deductions withheld from the tenant's deposit, it forfeits the right to withhold any portion of the deposit or to bring suit against the tenant for damages to the premises. *Id.* § 92.109(b). The landlord has the burden of proving that the retention of any portion of a tenant's deposit was reasonable. *Id.* § 92.109(c). Bad faith is presumed if the landlord fails either to return the deposit or provide a written description and itemization of deductions on or before the thirtieth day after tenant surrenders possession of the premises. *Id.* § 92.109(d).

### C.    Analysis

#### 1.    The proof supports the county court's finding of breach of the lease by failing to repair or replace screens.

Paragraph 26 of the lease ("Special Provisions") provides that the landlord will have "screens repaired or replaced that tenant has noted." Pilgrim testified that, contrary to this provision, the screens were not repaired or replaced. This evidence alone is legally sufficient to support the county court's finding that the Epsteins breached the lease by failing to repair or replace screens. *See, e.g.*, *Ergon, Inc. v. Dean*, 649 S.W.2d 772, 778 (Tex. App.—Austin 1983, no writ) (testimony of single witness held sufficient to support particular finding).

Pilgrim further testified that he verbally raised the issue of the screens with Stephan. He had also complained about the "missing and broken screens" to the Epsteins in two certified letters, which were admitted into evidence, as well as in other letters and e-mails that also were in the evidence. Pilgrim testified that when he sent his notice terminating the lease, the Epsteins had not fixed any of the broken screens.

Marilyn testified that the Epsteins repaired or replaced some of the screens, but did not get to the remainder due to "a continuous barrage of requests for very expensive" repairs from Pilgrim. According to her, Pilgrim instructed the Epsteins to focus on these other repair requests instead. She also claimed that a workman was going to provide an estimate regarding the repair or replacement of the screens, but

11

refused to do so because Pilgrim had blocked the access to the driveway with a sawhorse and a sign stating "Unsafe Driveway" and "Landlord Refuses Repair."

Deferring to the county court's assessment of the credibility of the witnesses and the weight to be afforded to their testimony, the evidence supporting the trial court's finding that the Epsteins breached the lease by failing to repair or replace screens is not so weak as to make it clearly wrong and manifestly unjust. In particular, we note that Marilyn did not dispute that not all of the screens had been repaired or replaced, Pilgrim's certified letters and other written communications contradict her testimony that he told the Epsteins to focus on other issues instead of the screens, and a bid for screen repair and replacement in the record undermines Marilyn's suggestion that Pilgrim's behavior made it impossible to obtain an estimate. Taken as a whole, the proof is legally and factually sufficient to support the trial court's finding. *See Chandler*, 428 S.W.3d at 407.

### 2. The proof supports the county court's finding that Pilgrim properly terminated the lease due to a health and safety issue.

The county court found that the Epsteins failed to make a diligent effort to repair a condition materially affecting Pilgrim's health and safety in violation of landlord-tenant statute and that Pilgrim properly terminated the lease based on this violation. *See* TEX. PROP. CODE ANN. § 92.056(b), (e)(1). It rested these findings on an ongoing rodent infestation of the leased premises.

Pilgrim testified that he asked the Epsteins to hire an exterminator after he found rat droppings in the water closet in the back bedroom. He described that area as "inundated with rat feces." This produced an odor problem. Pilgrim stated that he could not use the laundry or common area due to "the smell of rat urine and feces" and that there was "a stench in the house." The attic also showed evidence of infestation. He testified that Marilyn told him the property had been sprayed and disinfected, but he said the odor persisted and that he had two contractors out to the property to assess the issue. One of these contractors provided an itemized estimate of $2,499 to remedy the situation in late July, and Pilgrim provided this estimate to the Epsteins.

As with the screen issue, Pilgrim repeatedly complained in writing to the Epsteins about the presence of rats and the related odor problem. Two of these writings were certified letters, in which Pilgrim explicitly characterized this issue as a matter of health or safety. In the second letter, Pilgrim also stated that if this and other issues were not promptly addressed, he would terminate the lease and exercise his rights under Chapter 92 of the Texas Property Code. He subsequently sent the Epsteins a third certified letter in which he invoked Chapter 92 and terminated the lease. In light of this evidence, we conclude that there is legally sufficient proof to support the county court's finding that Pilgrim properly terminated the lease when the Epsteins failed to repair a condition materially affecting his health and safety.

Defense counsel cross-examined Pilgrim about an invoice for the rodent treatment made in late May and another invoice from late August for the cleaning of the attic and other activities. Pilgrim conceded that the Epsteins sprayed for the odor and that the smell was not as bad afterward. Consistent with his written complaints, he maintained on the stand that the odor still was not good after spraying. For example, in an e-mail from late July, Pilgrim wrote, "There has been a noticeable difference in the house after the spraying. The unpleasant smell in the house is not as bad. There remains a strong 'flat' or stale odor that is slightly sour. The rodent odors in the laundry area remain unchanged." On re-direct, he testified that the rat infestation was not confined to the laundry area.

Marilyn testified that she sent a pest control service provider to the leased property in late May to address the rat droppings. The provider placed traps and returned to retrieve rat carcasses. She said that the service provider also addressed the living areas about which Pilgrim complained. Marilyn contended that Pilgrim contributed to the rat infestation by leaving pet food outside. But she testified that the rodent problem was resolved before Pilgrim terminated the lease.

Deferring to the county court's assessment of the credibility of the witnesses and the weight to be afforded to their testimony, the evidence supporting the trial court's findings that the Epsteins failed to adequately repair a condition materially affecting Pilgrim's health and safety in violation of the landlord-tenant statute and

14

that Pilgrim properly terminated the lease based on this violation is not so weak as to make them clearly wrong and manifestly unjust. A third party contractor's estimate provided support for Pilgrim's position that remedying the rodent infestation was ongoing in late July. Taken as a whole, the proof is factually sufficient to support the judgment on this issue. *See Chandler*, 428 S.W.3d at 407.

3. **The proof supports the county court's finding that the Epsteins retained Pilgrim's security deposit in bad faith.**

The Epsteins challenge the county court's finding that they withheld Pilgrim's security deposit in bad faith, an issue on which they bore the burden of proof. TEX. PROP. CODE ANN. 92.109(c). Thus, they must show that the evidence conclusively proves their reasonableness to establish legal insufficiency or that the finding of bad faith is against the great weight and preponderance of the evidence to establish factual insufficiency. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Chandler*, 428 S.W.3d at 407–08.

The parties agree that Pilgrim's total security deposit was $1,445. After he terminated the lease and moved out, Stephan sent Pilgrim a letter declining to return the deposit. In this letter, Stephan stated that Pilgrim had violated the lease and damaged the property. Though he specified various dollars amounts for these violations and damages—$1,489 for interior and wall repairs and repainting, $325 for pest control, $130 for cleaning, $325 for a number of lease violations, and $600 minimum for rent—he did not purport to apply these sums to the deposit. Instead,

15

Stephan wrote that the Epsteins had "discounted charges dramatically" and enclosed a check for $600. Though characterized as a refund of the balance of the deposit, he stated it was offered "in settlement of any deposit and rent issues in full" by Pilgrim. Pilgrim returned the check.

Marilyn agreed on cross-examination that the Epsteins did not make the deductions for charges and damages discussed in Stephan's letter and that those figures were just an indication of what they thought they could deduct under the circumstances. In her own words, she did not base her numbers on any estimated costs; the point of the charges and damages stated in the letter to Pilgrim was to show him that the Epsteins were "being gracious" and giving him more than he was owed.

We conclude that the Epsteins did not conclusively prove their reasonableness. The trial court could have credited the Epsteins' use of a refund figure that Marilyn agreed was pulled "out of the air" or their use of a seemingly precise damage charge that was not based on an estimate or the actual cost of repairs as some evidence of bad faith. *See Alltex Constr., Inc. v. Alareksoussi*, 685 S.W.2d 93, 96 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) (proof that landlord charged an arbitrary amount for damages, charges were not based on actual cost of repairs, and itemized list was vague and ambiguous supported finding of bad faith). The Epsteins did not do what Chapter 92 required—they did not deduct damages and charges for which Pilgrim was liable under the lease or for its breach while returning the

16

remainder of his deposit with a written description and itemized list of the charges and damages. TEX. PROP. CODE ANN. § 92.104(a)–(c). Rather, they made an offer "in settlement of any deposit and rent issues in full," and withheld a sum not based on any itemization of damage. The law presumes that complete noncompliance with Chapter 92's security deposits provisions is in bad faith. *Id.* § 92.109(d).

The Epsteins bore the burden of proof to show that their refusal to unconditionally refund any part of Pilgrim's deposit was reasonable. TEX. PROP. CODE ANN. § 92.109(c); *Byler v. Garcia*, 685 S.W.2d 116, 120 (Tex. App.—Austin 1985, writ ref'd n.r.e.) ("The burden of proof is on the landlord to show his retention of the security deposit was reasonable, and the landlord must also carry the burden of proof to rebut the presumption of bad faith that arises when the deposit is not returned within thirty days."). The county court reasonably could have found that the Epsteins' refusal to refund any portion of Pilgrim's deposit unless he relinquished his statutory rights and remedies reflected bad faith. *See Reed v. Ford*, 760 S.W.2d 26, 30 (Tex. App.—Dallas 1988, no writ) (jury could have interpreted landlord's suggestion that it would keep deposit absent renewal of lease as bad faith). The proof is legally and factually sufficient to support the trial court's findings.

4. **The Epsteins' claims for offsets or credits for property damage or stolen materials are barred as a matter of law.**

The Epsteins contend that any judgment entered in favor of Pilgrim must be offset based on damage that Pilgrim did to smoke detectors, damage to the driveway,

and stolen building materials.

The trial court found that the Epsteins did not comply with Chapter 92's directives to deduct charges and damages for which Pilgrim was liable under the lease or for its breach and return the remainder of his deposit with a written description and itemized list of the charges and damages. TEX. PROP. CODE ANN. § 92.104(a)–(c). Noncompliance is presumed to be in bad faith. *Id.* § 92.109(d). Because the trial court impliedly concluded that the Epsteins failed to rebut this statutory presumption, they are foreclosed from bringing suit against Pilgrim "for damages to the premises." *Id.* § 92.109(b).

With respect to stolen materials, the Epsteins' live pleading at the time of trial did not assert a cause of action for conversion or otherwise allege theft of building materials. Nor did they seek a trial amendment to add such a claim. *See* TEX. R. CIV. P. 66. The county court did not address this issue in its final judgment or in its ruling from the bench. The Epsteins cannot appeal from a non-existent finding on a claim they did not assert below. *Coastal Liquids Transp., L.P. v. Harris Cty. Appraisal Dist.*, 46 S.W.3d 880, 885 (Tex. 2001) ("Claims not made to the trial court generally cannot be raised for the first time on appeal.").

## II. Attorney's Fees

Citing Rule 574a of the Texas Rules of Civil Procedure, which was in effect when Pilgrim filed his petition in small claims court and when he appealed from its

judgment to the county court, the Epsteins contend that Pilgrim was barred from seeking attorney's fees in his appeal to the county court because he was without an attorney in small claims court and therefore was ineligible to receive fees. *See* TEX. R. CIV. P. 574a (repealed 2013) (providing that "no new ground of recovery shall be set up by plaintiff" on appeal to county court). The Epsteins also rely on *Hamby Co. v. Palmer*, 631 S.W.2d 589 (Tex. App.—Amarillo 1982, no writ), in which the court held that a request for attorney's fees qualified as a ground of recovery so that a pro se plaintiff who did not include a request for fees in his justice court pleadings was barred from seeking them on appeal to the county court. *Id.* at 592.

*Hamby* is distinguishable. Unlike the plaintiff there, Pilgrim requested attorney's fees in his small claims court petition. Moreover, our sister court in *Jones v. Falcon*, 875 S.W.2d 29 (Tex. App.—Houston [14th Dist.] 1994, writ denied), has held that, when a statute like Chapter 92 of the Texas Property Code provides for an award of attorney's fees, it overrides the more general rule stated in former Rule 574a. *Id.* at 31–32; *accord Somers v. Aranda*, 322 S.W.3d 342, 346 (Tex. App.—El Paso 2010, no pet.); *Crumpton v. Stevens*, 936 S.W.2d 473, 476 (Tex. App.—Fort Worth 1996, no writ); *Richard v. Taylor*, 886 S.W.2d 848, 851 n.4 (Tex. App.—Beaumont 1994, writ denied). Following *Falcon*, we hold that Pilgrim was entitled to seek fees in the county court on appeal.

The Epsteins also contend that the county court exceeded its jurisdiction by awarding attorney's fees in the amount of $12,885. They maintain that this sum exceeds the jurisdiction of the small claims court in which Pilgrim initially filed suit, and that on appeal the county court had no more jurisdiction than could be conferred on it be the court below. Alternatively, they contend the county court's fee award was excessive.

Whether the fees awarded exceed the jurisdictional limits of the trial court presents a question of law, which we review de novo. *See City of Ingleside v. City of Corpus Christi*, 469 S.W.3d 589, 590 (Tex. 2015) (per curiam) (jurisdiction reviewed de novo); *Tucker v. Thomas*, 419 S.W.3d 292, 295 (Tex. 2013) (statutory entitlement to fees reviewed de novo). The assertion that the fees awarded were excessive is a challenge to the factual sufficiency of the proof. *DeNucci v. Matthews*, 463 S.W.3d 200, 214 (Tex. App.—Austin 2015, no pet.) ("The standard of review for an excessive damages complaint is factual sufficiency of the evidence.").

Small claims courts may entertain claims for "no more than $10,000, excluding statutory interest and court costs but including attorney fees." TEX. R. CIV. P. 500.3; *see also* TEX. GOV'T CODE ANN. §§ 27.060(a), 27.031(a)(1) (West Supp. 2015) (providing that justice courts shall preside over small claims and limiting jurisdiction of justice courts to civil matters "in which the amount in controversy is not more than $10,000, exclusive of interest"). Generally, "the county

court's appellate jurisdiction is confined within the limits of the justice court's jurisdiction." *Kendziorski v. Saunders*, 191 S.W.3d 395, 406 (Tex. App.—Austin 2006, no pet.). But this general rule does not apply to additional sums that are "sustained as a result of the passage of time, such as attorney's fees." *Id.* at 409. In other words, the county court may award attorney's fees in excess of the jurisdictional limits of the small claims court on appeal, because fees increase as litigation continues over time. *Id.*

Finally, with respect to the Epsteins' contention that the fees awarded were excessive, Pilgrim's attorney testified about his experience, the reasonableness of the hourly rates billed, and the estimated fees in the event of post-trial motions and appeal. In support, he introduced into evidence his retention agreement, a summary of Pilgrim's fees, and 30 pages of itemized billing statements. He also explained that the case was "document intensive" for its type and that it was necessary to prepare for trial twice due to a continuance requested by the defense shortly before the initial trial date. Defense counsel declined to cross-examine Pilgrim's attorney. Thus, the only proof in the record supports the fee award. We hold that sufficient evidence supports the county court's award of fees. *See Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547–48 (Tex. 2009) (when the evidence supporting a fee award "is clear, direct, positive and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon," a court as fact finder "may award

attorneys' fees as a matter of law in such circumstances, especially when the opposing party has the means and opportunity of disproving the testimony or evidence and fails to do so").

### III. Admissibility of Evidence

The Epsteins contend that the county court erred in admitting Pilgrim's photographs of the rodent problem into evidence. They contend that the county court should have excluded this evidence because Pilgrim failed to supplement or amend his pretrial discovery responses to disclose the inaccuracy of the dates noted in the photos, in violation of the discovery rules.

To preserve an evidentiary complaint for appellate review, a party must timely object to the evidence or move to strike it from the record, state the specific ground for doing so unless it is clear from context, and obtain a ruling. TEX. R. EVID. 103(a)(1); *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007); *Smith v. East*, 411 S.W.3d 519, 530 (Tex. App.—Austin 2013, pet. denied).

Pilgrim testified about the photographs of the premises, and the county court admitted these photographs into evidence. Defense counsel did not object to their admission. During cross-examination, Pilgrim testified that the date stamp on some of these photographs was inaccurate due to an incorrect camera setting. He said that this produced a date "discrepancy of two weeks or so" and affected the "first few photographs" taken in June. The date stamp of any photograph taken in July or

afterward was accurate. Given the Epsteins' failure to object to this evidence at trial, they have not preserved this issue for our review.

## IV.  Joint and Several Liability

The Epsteins contend that the county court erred in rendering judgment against them and their management company jointly and severally. Marilyn and Stephan maintain that they cannot be held liable for damages because the company was the lessor and Pilgrim did not plead an alter ego theory of liability.

### A.    Standard of Review

When, as here, the pertinent facts are not in dispute, the applicability of joint and several liability presents a pure issue of law, which we review de novo. *See Pacesetter Pools, Inc. v. Pierce Homes, Inc.*, 86 S.W.3d 827, 831 (Tex. App.—Austin 2002, no pet.) (stating pure questions of law reviewed de novo and treating right to contribution as pure question of law); *see also Hardy*, 176 S.W.3d at 275–76 (holding joint and several liability established based in uncontradicted proof).

### B.    Applicable Law

Pilgrim sued the Epsteins for breach of the parties' lease and violations of Chapter 92 of the Texas Property Code. With respect to the lease, Pilgrim bore the burden of proving the elements of his contract claim, including that the Epsteins were parties to the lease or were liable under the contract on some other basis. *See Anderton v. Cawley*, 378 S.W.3d 38, 60 (Tex. App.—Dallas 2012, no pet.) (plaintiff

must prove that the defendant has obligated himself under the contract). Members of limited liability companies generally are not liable on company contracts. *See* Tex. Bus. Org. Code Ann. § 101.114 (West 2012) ("Except as and to the extent the company agreement specifically provides otherwise, a member or manager is not liable for a debt, obligation, or liability of a limited liability company, including a debt, obligation, or liability under a judgment, decree, or order of a court."). Liability under Chapter 92, however, is a different matter. It imposes liability for violations of the statute on any "landlord," a term that includes an "owner, lessor, or sublessor of a dwelling." Tex. Prop. Code Ann. § 92.001(2) (West 2014). Thus, the owner of leased premises may be held liable under Chapter 92, even if he or she is not a party to the lease. *Id.*

## C. Analysis

The Epsteins contend that they are not liable for damages because they were not parties to the lease. With respect to Pilgrim's cause of action for breach of contract, they are correct. The signatories to the lease are Happy Bulldog Management and Pilgrim. It was undisputed at trial that Happy Bulldog was the name under which Lost Creek Ventures, LLC managed the leased property, and that the Epsteins were the company's sole members. Lost Creek's membership agreement is not in the record, and no evidence suggests that the agreement provides that its members are individually liable for company contracts. Hence, the Epsteins

themselves—as opposed to the company—are not liable for breach of the lease. TEX. BUS. ORG. CODE ANN. § 101.114.

But the county court awarded just $118.82 on Pilgrim's contract claim. It awarded the remaining $6,130 in damages for violations of Chapter 92. The Epsteins are liable for this sum, as they were the owners of the leased property, and their company likewise is liable for this sum, as it was the lessor. *See* TEX. PROP. CODE ANN. § 92.001(2) (defining "landlord" to include both owners and lessors). Thus, joint and several liability is appropriate with respect to this sum. The same is true of the county court's award of costs and fees, because Chapter 92 provides that a tenant may recover his court costs and attorney's fees from a landlord under the circumstances of this case.[1] *Id.* §§ 92.005(a), 92.0563(a)(5), 92.109(a). Thus, the county court's imposition of joint and several liability was appropriate with respect to these portions of the judgment.

In conclusion, we hold that the county court's judgment must be modified to provide that only Lost Creek, doing business as Happy Bulldog, is liable for the $118.82 awarded to Pilgrim for breach of contract. The Epsteins are not individually

---

[1]	When Pilgrim's counsel testified about fees and offered billing records into evidence, the Epsteins failed to object that this proof did not segregate fees attributable to Pilgrim's contract and statutory claims. Thus, they waived this issue on appeal. *Beard Family P'ship v. Comm. Indem. Ins. Co.*, 116 S.W.3d 839, 850 (Tex. App.—Austin 2003, no pet.) ("If a party does not object to the failure to segregate, it waives any appellate complaint.").

liable for his sum. The Epsteins and their company, however, remain jointly and severally liable for the remainder of the damages, court costs, and the attorney's fees awarded to Pilgrim by the county court in its judgment.

## V. Disqualification of Counsel

The Epsteins contend that the county court erred in not disqualifying Pilgrim's trial counsel. They maintain that the court was obligated to disqualify Pilgrim's attorneys, because his lead trial counsel was previously employed by the court as a staff attorney during the pendency of this lawsuit.

### A.    Standard of Review

We review a trial court's ruling on attorney disqualification for abuse of discretion. *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000); *Smith v. Abbott*, 311 S.W.3d 62, 73 (Tex. App.—Austin 2010, pet. denied). Because disqualification is a severe remedy, a party seeking this relief "bears a high burden, and must establish with specificity the basis for disqualification." *Smith*, 311 S.W.3d at 73. Neither mere allegations of ethical misconduct nor proof showing a remote possibility of misconduct suffice to carry this high burden. *Id.* Though they are not binding, courts traditionally consider the Texas Disciplinary Rules of Professional Conduct in assessing whether disqualification is warranted. *Id.* Even if the proof shows a violation of these rules, however, disqualification is appropriate only if the party seeking it can demonstrate actual prejudice. *Id.*

### B. Applicable Law

The Texas Rules of Disciplinary Professional Conduct provide that a "lawyer shall not represent anyone in connection with a matter in which the lawyer has passed upon the merits or otherwise participated personally and substantially as an adjudicatory official or law clerk to an adjudicatory official, unless all parties to the proceeding consent after disclosure." TEX. DISC. R. PROF'L CONDUCT 1.11(a). "Substantial" is defined by the rules as "meaningful significance or involvement." TEX. DISC. R. PROF'L CONDUCT, Terminology. Thus, personal and substantial participation does not include the exercise of purely administrative duties or functions. TEX. DISC. R. PROF'L CONDUCT 1.11, cmt. 1.

### C. Analysis

In their motion for new trial, the Epsteins contended that they learned for the first time after trial that Pilgrim's counsel had been employed by the county court as a staff attorney while this case was on file. They acknowledged that they could not show that Pilgrim's counsel had personally and substantially been involved with the case in her role as staff attorney for the court.

Pilgrim's counsel submitted an affidavit in response to the Epsteins' disqualification request. In her affidavit, counsel denied personal and substantial participation in the case, noting that the county court neither held hearings nor entered orders in the suit during her tenure as a staff attorney. Pilgrim's counsel

averred that she "never learned of, worked on, or discussed this action with any member of the Court's staff" during her tenure there. She further averred that she informed the Epsteins' attorney of her past employment with the court before trial.

Because the Epsteins' request for disqualification is based on speculation that is contradicted by the evidence, we hold that the county court did not abuse its discretion in refusing to disqualify Pilgrim's counsel. *See Smith*, 311 S.W.3d at 73.

## VI. Motions for New Trial and Continuance

The Epsteins contend that the county court erred in not granting them a continuance during trial based on Pilgrim's introduction of false evidence. They maintain that Pilgrim relied on misdated photographs at trial and failed to disclose or correct the inaccuracy of these dates prior to trial, and that the unexpected disclosure of this inaccuracy at trial prejudiced their defense.

The Epsteins also contend that the county court erred in not granting their motion for new trial. They maintain that the admission of the misdated photographs and Pilgrim's failure to disclose driveway repairs prior to trial tainted the proceedings and that newly discovered evidence shows that Pilgrim perjured himself regarding the impact of his housing situation on unrelated child custody proceedings.

Finally, the Epsteins contend that the county court erred in not granting them a continuance on the hearing of their motion for new trial. They maintain that they

were unable to adequately prepare for this hearing because they retained new counsel after trial and subsequently were involved in a debilitating car accident.

## A. Standard of Review

We review a trial court's denial of a continuance to determine whether it "committed a clear abuse of discretion on a case-by-case basis." *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004). To be an abuse of discretion in this context, the trial court's decision must be "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002).

Similarly, we review a trial court's denial of a motion for new trial for abuse of discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). In general, the trial court abuses its discretion only "if it acts without reference to any guiding principles or acts arbitrarily or unreasonably." *Beck v. Law Office of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 445 (Tex. App.—Austin 2009, no pet.). With respect to newly discovered evidence in particular, a party is not entitled to a new trial if the evidence is "merely cumulative of that already presented" or tends "only to impeach the testimony of the adversary." *Connell Chevrolet Co., Inc. v. Leak*, 967 S.W.2d 888, 894 (Tex. App.—Austin 1998, no pet.).

Finally, to preserve procedural issues like the denial of a new trial or continuance for appellate review, a party must timely raise the issue below and

29

secure a ruling. Tex. R. App. P. 33.1(a)(1)–(2); *e.g.*, *Lemons v. EMW Mfg. Co.*, 747 S.W.2d 372, 373 (Tex. 1988) (per curiam) (point of error waived by party's failure to move for continuance or otherwise object); *Markham v. Diversified Land & Exploration Co.*, 973 S.W.2d 437, 441 (Tex. App.—Austin 1998, pet. denied) (party failed to preserve issue for appellate review where it withdrew motion for continuance). Procedural errors generally must be raised in the trial court, because it usually can correct any error if the error is brought to its attention. *Morris v. O'Neal*, 464 S.W.3d 801, 806–07 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

**B.  Analysis**

When it became apparent during trial that some of Pilgrim's photographs were misdated, the Epsteins did not seek a continuance, so they cannot complain that the county court erred in not granting them one mid-trial. Tex. R. App. P. 33.1(a)(1)–(2). Nor did the trial court abuse its discretion in refusing to grant them a new trial based on the misdated photographs, given that Epsteins did not object to the admission of these photographs. *See In re United Servs. Auto. Ass'n*, 446 S.W.3d 162, 175 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding) (directing trial court to vacate new trial order and holding that it could not grant new trial predicated on admission of evidence to which party did not object at trial).

Nor did the county court abuse its discretion in refusing to grant the Epsteins' motion for new trial based on Pilgrim's alleged failure to disclose repairs he made

to the driveway prior to trial. Neither the Epsteins' discovery requests nor Pilgrim's responses are in the record. In their answer, the Epsteins counterclaimed for damage to the driveway. Thus, their own pleading contradicts their claim of surprise at trial. In addition, Marilyn testified at trial about the damage allegedly caused by Pilgrim's driveway repairs. Accordingly, we conclude that the county court did not act arbitrarily or unreasonably in declining to grant a new trial on the basis of Pilgrim's alleged failure to disclose these repairs before trial.

The county court likewise did not abuse its discretion in refusing to grant the Epsteins a new trial based on newly discovered evidence. At trial, Pilgrim testified that he was scheduled to have custody of his daughters in 2010, but that they lived with their mother after he terminated his lease. He also testified that he had to make support payments to his ex-wife as a result of his daughters' change in living arrangements. The Epsteins contend that court records from Pilgrim's divorce show that he had joint custody of the children and therefore testified falsely. Even assuming that this evidence could not have been obtained before the trial, it concerns a collateral matter of remote relevance, if at all, only to witness credibility. Accordingly, we hold that the county court did not act arbitrarily or unreasonably in declining to grant a new trial on the basis of this evidence, which would have tended only to impeach Pilgrim's testimony. *See Connell Chevrolet*, 967 S.W.2d at 894.

As none of their asserted errors requires reversal, we cannot conclude that the county court's refusal to delay consideration of the Epsteins' new trial motion was "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *BMC Software*, 83 S.W.3d at 800.

## CONCLUSION

We modify the county court's judgment to provide that Marilyn and Stephan Epstein are not individually liable for the $118.82 awarded to Pilgrim for breach of the lease. We otherwise affirm the county court's judgment. All pending motions are dismissed as moot.

Jane Bland
Justice

Panel consists of Justices Higley, Bland, and Massengale.