**IN RE UNITED SERVICES AUTOMO-
BILE ASSOCIATION, Relator**

NO. 01-17-00048-CV

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued June 13, 2017

Robert T. Owen, Levon G. Hovnatanian, MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P., 808 Travis, 20th Floor, Houston, TX 77002, for Relator.

Richard D. Daly, Melissa Waden Wray, DALY & BLACK, P.C., 2211 Norfolk St., Suite 800, Houston, Texas 77098, for real party in interest.

Panel consists of Justices Keyes, Huddle, and Lloyd.

## OPINION

Rebeca Huddle, Justice

In the underlying case, the trial court has twice entered an order granting a new trial—once in 2013 and again in 2016. In a published opinion, we granted mandamus relief and vacated the 2013 new trial order, *see In re United Servs. Auto. Ass'n*, 446 S.W.3d 162, 166 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding), *mand. denied*, 487 S.W.3d 170 (Tex. 2016), holding that the trial court's reasons for granting a new trial were unsupported by the record and improper. Yet the trial court cited in its 2016 new trial order the same reasons for granting another new trial as were articulated in the 2013 order.

Our opinion in the earlier mandamus proceeding analyzed the merits of the 2013 order, and it held that none of the reasons articulated justified a new trial and that the trial court abused its discretion by entering the order. It became the law of the case, which the trial court was not free to disregard on remand, and it bars relitigation of the same issues in this subsequent proceeding. Accordingly, we hold that the law of the case doctrine applies and bars the trial court from granting a new trial based on reasons we previously rejected. We conditionally grant mandamus relief and direct the trial court to vacate its 2016 new trial order and enter judgment on the jury's verdict.

## Background

### A. The Bents' insurance policy

In 2005, Mark and Stacey Bent bought a home in the City of Piney Point for $1 million. The Bents improved the home, and on September 5, 2008, an appraiser estimated its value at $1.6 million.

The Bents purchased a homeowner's policy from USAA. The policy covered losses up to $1.34 million, but excluded losses caused by mold, microorganisms, or operation of ordinances or other law. One provision central to this dispute is the "loss payment" provision, which established a 5-day deadline for payment of claims in certain circumstances:

> If we notify you that we will pay your claim, or part of your claim, we must pay within 5 business days after we notify you. If payment of your claim or part of your claim requires the performance of an act by you, we must pay within 5 business days after the date you perform the act.

But a longer deadline applied to claims resulting from weather or major natural disasters: if a claim resulted "from a weather related catastrophe or a major natural disaster, each claim handling deadline ... is extended for an additional 15 days."

### B. Hurricane Ike

On September 13, 2008, Hurricane Ike damaged the home. Stacey reported a claim to USAA, which assigned an adjuster to investigate. After visiting the property, the adjuster evaluated the damages at approximately $7,500, which he later revised upwards to $14,302.33. USAA subtracted the Bents' deductible and mailed the Bents a letter approving their claim. On the same day, USAA issued a check for $1,162.33 and marked the claim closed. According to Stacey, the cost of removing fallen trees was not included in this initial payment because the adjuster claimed those costs were not covered.

In December 2008, the Bents obtained a $500,000 home equity loan. At that time, they both acknowledged in writing that the home had a fair market value of $1.6 million and that they had "no knowledge of any condition, proceeding, defect, casualty or any other matter now or potentially

existing that would affect the [fair market value]."

## C. The April 2009 flood

In April 2009, the home was damaged by a flood, and Stacey reported the claim. While mitigating the flood damage, workers discovered mold in the walls. Stacey reported the mold to USAA, and USAA's adjusters informed the Bents that mold damage was not covered. The Bents signed a proof of loss stating that the flood caused an estimated $93,288.27 in further damages to the home. The Bents took the position at trial, however, that at least some of the mold was attributable to leaks in the roof caused by the hurricane rather than the flood, which USAA had "missed" during its original inspection.

After the flood, the Bents discovered additional damage to the roof, not included in USAA's initial damage appraisal, which they attributed to Hurricane Ike and reported to USAA. In May 2009, USAA conducted an inspection at which Stacey and a contractor hired by the Bents were present. USAA found water damage to the roof and interior of the house beyond that documented in the first inspection after the hurricane, hail damage to the roof, and damage from foot traffic. USAA's inspector determined that the roof's shingles were no longer available and therefore recommended a roof replacement instead of repair. At the same time, Stacey and the inspector discussed the cost of removing the fallen trees, and the inspector stated that the homeowner's policy covered the costs of removing trees from the driveway if the Bents could produce proper documentation. Accordingly, in June 2009, USAA revised the total estimate of the damages to the home attributable to Ike, notified the Bents that it would pay an additional amount, and issued a further payment on the same day.[1]

## D. The Bents' pursuit of their insurance claims

In July 2009, after another inspection at which Stacey and a contractor were present, USAA further revised the total estimate of the damages to the home attributable to Ike to $98,079.62. It notified the Bents of this estimate and made a corresponding payment. Also in July 2009, Stacey obtained an estimate of $162,174.85 for the total cost of repairs attributable to Ike or the flood.

In October 2009, the Bents submitted another estimate of additional damages, including items not previously identified during USAA's inspections of the home. Because the estimate was not fully itemized, USAA requested additional information and informed the Bents through a series of phone calls and written correspondence that it could not make further payments until it received additional information.

In November 2009, USAA conducted a further inspection, again with Stacey and a contractor present, at which USAA's inspector explained the additional detail that USAA required. The Bents did not send further information until December 2009, when an attorney acting on their behalf wrote to USAA requesting that it direct all further correspondence to him. USAA corresponded with that attorney until he withdrew from representing the Bents, then corresponded with the Bents directly and

---

1. USAA subsequently stopped payment on this check and issued a new one. The original check required signature by USAA Federal Savings Bank, which had issued the Bents a home equity loan. While USAA Federal Savings Bank's signature would be required if the loan was a mortgage, it was not required for a home equity loan. Thus, at the Bents' request, USAA issued a new check listing the Bents as the only payees.

with another attorney throughout late 2009 and the first half of 2010, but received no additional information supporting the Bents' claims under the homeowner's policy.

In December 2009, USAA invoked the appraisal process referenced in the homeowner's policy. The Bents' attorney denied USAA's request to begin the appraisal process, arguing that USAA had breached the homeowner's policy.

### E. Piney Point Ordinances

After Hurricane Ike struck, Stacey met at least 10 times with Annette Arriaga, the City of Piney Point's director of planning, development, and permits. Arriaga also serves as the secretary for the Planning and Zoning Commission and the Board of Adjustments, which oversees variances to the city's ordinances.

In June 2010, Arriaga wrote the Bents, informing them that the city's estimate of damages to their home exceeded both 50 percent of the home's value and the amount of $300,000. Repair costs of that magnitude triggered City of Piney Point ordinances requiring that any repairs bring the home in compliance with the city's building codes. To make their home comply with the building codes would have required the Bents to raise the home's foundation. Arriaga wrote that she was "apprehensive about the [overall] health and welfare of the structure," and, "I would recommend that the structure be replaced, re-built."

Arriaga testified that she has no discretion when notifying homeowners of potential code violations, but merely informs them of the relevant ordinances. She and others in her office review repair or improvement estimates provided by homeowners and determine whether the proposed costs exceed the greater of $150,000 or 50% of the value of all improvements on the lot. In the case of the Bents' home, the applicable threshold was $194,535 in 2009 and $150,000 in 2010. Thus, if the Bents had repaired their hurricane damages in late 2008 and then repaired flood damages in 2009, neither alone would have triggered application of the city's ordinances. Arriaga testified that she informed Stacey that the Bents could seek a variance, but Stacey never asked a contractor to visit Arriaga with her regarding any variances or negotiations with the city, nor did the Bents request a variance of the city's ordinances.

### F. USAA's August 2010 letter

In August 2010, USAA sent a letter to the Bents' attorney. The letter presented a "revised dwelling estimate," which it asked the attorney to "review ... with Mr. and Mrs. Bent." USAA wrote that it had revised the total estimate of the damages to the home attributable to Ike to $136,539.41. Of that amount, after accounting for depreciation and the Bents' deductible, USAA stated that it was "prepared to send an additional actual cash value payment" in the amount of $27,416.86, which would have brought the total payments made to $89,123.64. The August 2010 letter described the latter amount as the "actual cash value settlement" and stated, "The Loss Settlement Provision stipulates that the loss to your covered property be settled at actual cash value."

According to USAA's claims record and the testimony of its corporate representative, Leesa Tomsett, this amount was not payable until the Bents took action to accept it as a settlement of their claim. Therefore, unlike each of the prior payments, USAA did not issue a check at the time it sent the August 2010 letter. The Bents did not respond to this letter, but USAA nonetheless issued a check in

March 2012, after the Bents had sued, for $27,416.86 plus interest at the rate of 18%.

## G. Foreclosure of the Bents' home

In late 2010, the Bents stopped making their mortgage payments to Wells Fargo. The Bents attempted to accept an offer to sell their home for $910,000, but the deal fell through, and Wells Fargo ultimately foreclosed. The home sold at auction in August 2012 for $655,000.

## H. The underlying suit

The Bents sued USAA for breach of the homeowner's policy, violation of the Texas Insurance Code's requirements regarding prompt payment of claims, and violation of the Insurance Code's prohibition on unfair or deceptive practices.

Tomsett, USAA's corporate representative, testified regarding the five-business-day payment requirement and 15-day extension period applicable to weather-related catastrophes. As she explained, both of these requirements are set out both in the homeowner's policy and in the Texas Insurance Code. *See* TEX. INS. CODE § 542.057(a) ("[I]f an insurer notifies a claimant ... that the insurer will pay a claim or part of a claim, the insurer shall pay the claim not later than the fifth business day after the date notice is made."); *id.* § 542.059(b) ("In the event of a weather-related catastrophe or major natural disaster, as defined by the commissioner, the claim-handling deadlines imposed under this subchapter are extended for an additional 15 days.").

The Bents also presented the testimony of Richard Daly, one of their attorneys, who testified as to the amount of work that the Bents' attorneys had performed, market rates for such services, and the Bents' contingent-fee agreement in connection with their suit against USAA. Daly opined that the jury should award an amount equivalent to at least 40% of the Bents' recovery as attorney's fees.

The jury found that USAA had not breached the policy, but that it did make a statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact. The jury also found that USAA did not knowingly make such a statement. The jury awarded damages in the amounts of $150,000 for the diminished value of the Bents' home and $250,000 for their mental anguish. The jury also awarded $185,000 in attorney's fees through trial, but awarded zero attorney's fees for any appeals.

## I. The 2013 new trial order

The trial court initially entered judgment on the jury's verdict, but later granted the Bents' motion for new trial by order dated May 7, 2013. The trial court articulated five reasons for granting a new trial:

(1) the jury's finding that USAA did not breach the homeowner's policy was contrary to the great weight and preponderance of the evidence;

(2) USAA violated the trial court's order in limine regarding the issue of code variances;

(3) the evidence did not support the jury's award for the diminished value of the Bents' home;

(4) the jury improperly failed to award appellate attorney's fees; and

(5) the parties disputed whether mental anguish damages required a "knowingly" predicate, but failed to argue for such a predicate before the case was submitted to the jury.

USAA petitioned this Court for a writ of mandamus directing the trial court to vacate its order granting a motion for new trial, and we conditionally granted mandamus relief, concluding that the trial court's

reasons for granting a new trial were improper. *United Servs. Auto. Ass'n*, 446 S.W.3d at 166. We directed the trial court to vacate its order granting the motion for new trial and to enter judgment on the jury's verdict. *Id.* at 181.

The Bents petitioned the Texas Supreme Court for a writ of mandamus complaining that we abused our discretion in rejecting four of the trial court's proffered justifications for the new trial order. The Supreme Court denied the petition, concluding that three of the reasons for new trial given in the trial court's order were facially invalid and a fourth was unsupported by the record. *In re Bent*, 487 S.W.3d 170, 184 (Tex. 2016) (orig. proceeding).

On remand in the trial court, the Bents filed a second motion for new trial. The trial court vacated its 2013 order granting a new trial, entered judgment on the jury's verdict, and then granted the Bents' second motion for new trial by order dated November 17, 2016.

**J. All of the trial court's reasons for granting a new trial in 2016 were reasons it articulated as reasons for granting a new trial in 2013.**

The 2016 new trial order identifies three reasons for granting a new trial—each is based on the trial court's conclusion that three jury findings are based on factually insufficient evidence:

(1) the evidence is factually insufficient to support the jury's finding that USAA did not breach the contract when it failed to pay the claim in a timely manner in accordance with the policy;

(2) the evidence is legally and factually insufficient to support the jury's award of $150,000 in diminished value damages and the award is manifestly too small; and

(3) the evidence is factually insufficient to support the jury's award of zero appellate attorney's fees and the award is manifestly too small.

These are the same as three of the reasons the trial court articulated in its 2013 order, all of which we addressed and rejected in our 2014 opinion. *See United Servs. Auto. Ass'n*, 446 S.W.3d at 171–80.

## Discussion

USAA contends that this Court has already determined that sufficient evidence supports the jury's findings on the three grounds the trial court gave as reasons for granting a new trial. Accordingly, USAA contends that the trial court abused its discretion in granting the motion for new trial because its order was contrary to the law of the case. USAA also contends that, if we were to conduct a merits review anew, we would likewise conclude that the trial court's reasons for granting a new trial in 2016 are unsupported by the record. The Bents respond that the law of the case does not apply and that the record supports the trial court's articulated reasons for entering its 2016 new trial order.

### A. Standard of Review

■ To be entitled to mandamus relief, a relator generally must demonstrate (1) the trial court clearly abused its discretion; and (2) the relator has no adequate remedy by appeal. *In re Reece*, 341 S.W.3d 360, 364 (Tex. 2011) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam) (citing *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding)). "In

determining whether the trial court abused its discretion with respect to resolution of factual matters, we may not substitute our judgment for that of the trial court and may not disturb the trial court's decision unless it is shown to be arbitrary and unreasonable." *In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding) (per curiam) (citing *Walker*, 827 S.W.2d at 839–40). In other words, under an abuse-of-discretion standard, we defer to the trial court's factual determinations if they are supported by the evidence, but we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding) (citing *Brainard v. State*, 12 S.W.3d 6, 30 (Tex. 1999)). A trial court's order granting a new trial may be reviewed by an appellate court in a mandamus proceeding. *See In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 757–58 (Tex. 2013) (orig. proceeding); *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012) (orig. proceeding).

 A new trial order must satisfy two "facial requirements." *Bent*, 487 S.W.3d at 173. One, the order must state a legally appropriate reason for the new trial. *Id.* Two, the stated reason must be specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reasons from the case's particular facts and circumstances. *Id.* The order must satisfy both requirements, or it is an abuse of discretion correctable by mandamus. *United Scaffolding*, 377 S.W.3d at 688–89.

 But even if a new trial order is sufficient on its face, a relator can show an abuse of discretion and an entitlement to mandamus relief if after a merits review the record does not support the trial court's rationale for ordering a new trial. *Bent*, 487 S.W.3d at 173 (citing *Toyota*, 407 S.W.3d at 749); *see also In re Athans*, 478 S.W.3d 128, 133 (Tex. App.—Houston [14th Dist.] 2015, orig. proceeding) (appellate court may review correctness or validity of trial court's reasons for granting new trial in mandamus proceeding). "A trial court's articulated reasons for granting a new trial must be supported by the underlying record; if not, the new trial order will not survive mandamus review." *Athans*, 478 S.W.3d at 133 (citing *Toyota*, 407 S.W.3d at 758).

## B. Law of the Case Doctrine

 The law of the case doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages. *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986); *Trevino v. Turcotte*, 564 S.W.2d 682, 685 (Tex. 1978). By narrowing the issues in successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency. *Hudson*, 711 S.W.2d at 630. The doctrine is based on public policy and is aimed at putting an end to litigation. *Id.* The application of the law of the case doctrine lies within the discretion of the court, depending on the circumstances of the case. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). The doctrine does not necessarily apply when either the issues or the facts presented in successive appeals are not substantially the same as those involved in the first trial. *Pitman v. Lightfoot*, 937 S.W.2d 496, 513 (Tex. App.—San Antonio 1996, writ denied). Moreover, it is an exception to the law of the case doctrine that the original decision was clearly erroneous. *Briscoe*, 102 S.W.3d at 716.

 Although an original proceeding is not an "appeal," the law of the case doctrine applies when an issue has been resolved on the merits in a prior mandamus

proceeding, even though it does not proceed to a court of last resort or the issues raised have not been resolved by a court of last resort. *See In re Guardianship of Cantu de Villarreal*, 330 S.W.3d 11, 20–21 (Tex. App.—Corpus Christi 2010, no pet.) (holding law of the case doctrine prevented reconsideration of issue decided in earlier mandamus petition); *B S P Mktg., Inc. v. Standard Waste Sys., Ltd.*, No. 05-03-00518-CV, 2004 WL 119235, at *1–2 (Tex. App.—Dallas Jan. 27, 2004, no pet.) (mem. op.) (decision of appellate court in mandamus proceeding that relator corporation failed to show trial judge abused discretion in dismissing relator's appeal was law of the case and barred corporation's appeal of order finding its appeal bond deficient); *see also Landerman v. State Bar of Tex.*, 247 S.W.3d 426, 433 (Tex. App.—Dallas 2008, pet. denied) (stating "[r]eview of a trial court's action under the abuse of discretion standard is a question of law"). If the appellate court resolves a question of law in a mandamus proceeding, that merits determination is the law of the case. *See Cantu de Villarreal*, 330 S.W.3d at 20–21 (law of the case doctrine precluded appellate court from reconsidering merits issue resolved in previous mandamus proceeding when there were no new facts, analysis, or argument to change disposition of issue); *B S P Mktg., Inc.*, 2004 WL 119235, at *2 ("the merits determination made in the prior original proceeding is the law of this case").

For example, in *B S P Marketing, Inc. v. Standard Waste Systems, Ltd.*, No. 05-03-00518-CV, 2004 WL 119235 (Tex. App.—Dallas Jan. 27, 2004, no pet.) (mem. op.), the appellant asked the Dallas Court of Appeals to reverse the county court's dismissal of its case for lack of jurisdiction on the grounds that its appeal bond was insufficient. *Id.* at *1. However, the appellant previously had filed a petition for writ of mandamus arguing that the county court had abused its discretion in dismissing the case, and the appellate court had concluded in that proceeding that the appellant "failed to show the trial judge abused his discretion in dismissing" the case. *Id.* at *2. Accordingly, the court applied the law of the case doctrine and concluded that its previous merits determination regarding the same issue being raised on appeal was the law of the case. *Id.*

## C. Analysis

 Under the law of the case doctrine, questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages. *Hudson*, 711 S.W.2d at 630; *Trevino*, 564 S.W.2d at 685. Here, the trial court's rationales for entering the 2016 new trial order disregard and contradict questions of law decided in our 2014 opinion—namely, whether sufficient evidence supports the jury's findings regarding breach, diminished value, and appellate attorney's fees. Our opinion addressed each of these issues in depth and on the merits.

### Jury's "no" finding on breach of contract

The trial court's 2013 order stated that the jury's finding that USAA did not breach the Bents' homeowner's policy by failing to make timely payments was so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *United Servs. Auto. Ass'n*, 446 S.W.3d at 171. In support of this conclusion, the trial court quoted the policy's loss payment provision and reasoned,

> Hurricane Ike hit the Texas coast on September 13, 2008. The testimony of Stacey Bent established that Plaintiffs made an insurance claim within days of that event and that Defendant notified

Plaintiffs it would pay Plaintiffs' claim. Further, the testimony of Stacey Bent and the individual adjusters on the claim established that six different, and increasing, estimates were made by Defendant between the initial estimate on October 6, 2008, and the final estimate on August 28, 2010, and none of Defendant's payments to Plaintiffs were made within the required 5 business days.

Defendant did not offer any testimony to controvert Plaintiffs' evidence that Defendant failed to make the required payments within 5 business days.

*Id.* Regarding this reasoning, our 2014 opinion noted: "[c]ritically, the loss payment provision in the policy—like the Insurance Code—requires that USAA make a payment within 5 business days of its notifying the Bents that it would pay all or part of their claim or, if payment required additional acts by the Bents, within 5 business days of the date on which they performed such acts." *See id.* at 172 (citing TEX. INS. CODE § 542.057(a)). We concluded that "[a]lthough the Bents and USAA hotly contested the appropriate amount and scope of the Bents' homeowners' policy claim, the record contains no evidence that USAA ever notified the Bents that it would pay a claimed amount and then failed to make a timely payment in that amount." *Id.* Specifically with respect to the August 2010 letter that the Bents claimed was a notification that USAA would make a payment that it did not make within five days and USAA claimed was a settlement offer, we concluded that "the evidence conflicted as to both the nature of the August 2010 letter and the Bents' obligations, if any, in responding to it." *Id.* at 172–73. Accordingly, after examining all the evidence, we concluded that "a rational juror could find that USAA did not breach the homeowner's policy" and that the trial court abused its discretion by granting a new trial on the basis that the

jury incorrectly failed to find a breach of that policy. *Id.* at 173.

Despite this, the trial court's 2016 new trial order includes a finding contrary to our holding: insufficient evidence supports the jury's finding of no breach because USAA "offered no more than a scintilla of evidence that it paid the [Bents'] claim in full within five business days of either the October 23, 2008, or August 28, 2010, notification letters."

### *Diminished value award*

The trial court's third reason for granting a new trial in 2013 was that the $150,000 diminished value award was unsupported and "seems arbitrary." *Id.* at 176. The trial court reasoned,

The Court agrees that the $150,000.00 damage award seems arbitrary, given the evidence that was presented. But the Court is not inclined to substitute its opinion for that of the jury. Texas Rule of Civil Procedure 320 specifically provides that "new trials may be granted when the damages are manifestly too small or too large." The Court believes that the damages awarded by the jury for diminished value of Plaintiffs' home was not supported by the evidence at trial. Thus the Court finds good cause for a new trial.

*Id.*

We concluded in our 2014 opinion that the jury's $150,000 award was not against the great weight and preponderance of the evidence. *See id.* at 176–77. The verdict form asked the jury whether USAA engaged in unfair or deceptive acts or practices and, if so, the "diminished value of the Bents' home" due to such acts or practices, which goes to the fair market value of the home. *Id.* at 177. The evidence at trial "established a potential range of diminished value damages from zero to at least $725,000," including a range of

$14,000 to more than $300,000 if the jury concluded that the home could have been repaired. *See id.* at 177. We noted that the parties adduced conflicting evidence regarding whether the home could have been repaired. *See id.* at 174–76. Because the jury's award of $150,000 fell within the range established by the evidence at trial, we held that it was not against the great weight and preponderance of the evidence and that the trial court abused its discretion by granting a new trial on the basis that the jury's award of diminished value damages was arbitrary or unsupported by the evidence. *See id.* at 177–78.

But the trial court's second reason for granting a new trial in 2016 is contrary to this holding. It states that insufficient evidence supports the jury's award of diminished value damages. The trial court rejected the idea that evidence regarding repair estimates ranging from $14,000 to $300,000 could establish a range for diminished value even though we reached the contrary conclusion.

### Appellate attorney's fees

The trial court's fourth reason for granting a new trial in 2013 was that the jury's award of zero appellate attorney's fees was against the great weight of the evidence and that an award of fees was mandatory. *Id.* at 178. The trial court reasoned that Chapter 38 of the Texas Civil Practice and Remedies Code and Chapters 541 and 542 of the Texas Insurance Code mandate awards of attorney's fees, including appellate attorney's fees, when a plaintiff prevails on a breach of contract claim or Insurance Code claim, respectively. *Id.* (citing TEX. CIV. PRAC. & REM. CODE §§ 38.001–.003; TEX. INS. CODE §§ 541.152(a)(1), 542.60(a)). It continued,

Since Plaintiffs prevailed on their [Insurance Code Chapter] 541 claims, they were entitled to an award of attorney's fees for trial and through appeal. More-

over, as was mentioned above, the Court finds that USAA breached the insurance agreement as a matter of law. The jury answered "no" to the breach of contract question. Thus, it is unclear how that answer affected the total attorney's fees awarded by the jury ($185,000). That number may very well have been higher had the jury properly answered the breach of contract question. In any event, the jury could not legitimately award $0.00 for Plaintiffs' attorney's fees on appeal. Thus, the Court finds good cause for a new trial.

*Id.*

In our 2014 opinion, we concluded that the trial court abused its discretion in finding that USAA breached the Bents' homeowner's policy as a matter of law, that it likewise abused its discretion in finding that the jury was required to award attorney's fees for the Bents' breach of contract claim. *Id.* Yet the trial court's third reason for granting a new trial in 2016 contradicts this analysis. It states that insufficient evidence supports the jury's award of $0 in appellate attorney's fees because it is against the great weight and preponderance of the evidence and manifestly too small.

Because our 2014 opinion resolved these legal issues on the merits, the trial court was constrained by the law of the case doctrine and was not at liberty to disregard and contradict our holdings. *See Cantu de Villarreal*, 330 S.W.3d at 20–21 (law of the case doctrine applied where appellate court had resolved issue presented to it on the merits in previous mandamus proceeding); *B S P Mktg., Inc.*, 2004 WL 119235, at *1–2 (applying law of the case doctrine to issue on appeal where appellate court had resolved issue on merits in earlier mandamus proceeding); *see also Landerman*, 247 S.W.3d at 433 (determination that trial court has abused its discretion in

taking some action is a question of law); *Hudson*, 711 S.W.2d at 630 (application of law of the case doctrine means that question of law decided by appellate court governs case in subsequent stages); *Trevino*, 564 S.W.2d at 685 (when court has decided question of law, law of the case doctrine means that decision governs case throughout subsequent stages). Accordingly, we conclude that the trial court abused its discretion in entering the 2016 new trial order and USAA is entitled to mandamus relief.

The Bents argue that the law of the case doctrine does not apply for three reasons: (1) the issues in the two proceedings are not substantially the same; (2) the Texas Supreme Court did not reach the issue of whether the three bases for the new trial set forth in the 2016 order are supported by the record—it held only that these grounds, as articulated in the 2013 order, were facially invalid, and (3) our previous decision was clearly erroneous. We consider each of these contentions in turn.

**1. The issues in the two proceedings are substantially the same.**

The Bents contend that we should not apply the law of the case doctrine because the issues presented in this mandamus proceeding are not substantially the same as those presented in the first proceeding. They contend that the reasons in the two new trial orders "are far from identical," because the trial court included greater explanation in its 2016 order. While the orders are not identical, the Bents acknowledge that the three reasons given by the trial court in the 2016 order are three of the reasons contained in the 2013 order—the three that the Texas Supreme Court concluded were facially deficient. While these reasons are supported by more explanation in the 2016 order, the reasons given are identical—that the jury's findings regarding breach, diminished value damages, and appellate attorney's fees are supported by factually insufficient evidence. We analyzed whether those three jury findings were supported by sufficient evidence in our first opinion and concluded that each of them were. Nothing about the underlying record has changed between the first mandamus proceeding and this one. Accordingly, the issues presented to us—and that we decided in our 2014 opinion—are substantially the same. *See Cantu de Villarreal*, 330 S.W.3d at 20–21; *see also Pitman*, 937 S.W.2d at 513 (law of the case doctrine applies where issues or facts presented to appellate court are substantially the same as those involved in previous appellate proceeding).

**2. The fact that the Texas Supreme Court did not reach the question of whether the record supported the three relevant reasons does not provide a basis for declining to apply the law of the case doctrine.**

The Bents also contend that the law of the case doctrine does not apply because the Texas Supreme Court concluded only that the three reasons in the 2013 order were facially invalid and did not reach the issue of whether they were supported by the record. But the Bents acknowledge that the reason the Supreme Court did not reach the question of whether these three reasons were supported by the record was because the Supreme Court concluded that the reasons were facially deficient and resulted in the denial of the Bents' mandamus petition without the need to reach the question we reached in our opinion—whether the reasons were supported by the record. The Bents do not address any of the authority holding that a mandamus proceeding at the appellate court level that reaches a merits issue, such as our 2014 opinion, is binding on subsequent stages of the case with respect to that issue. *See Cantu de Villarreal*, 330 S.W.3d at 20–21;

*B S P Mktg., Inc.*, 2004 WL 119235, at *1–2; *see also Landerman*, 247 S.W.3d at 433. Accordingly, the fact that the Supreme Court denied the Bents' mandamus petition on different grounds is not a basis to decline to apply the law of the case doctrine based upon our 2014 opinion.

### 3. Our previous opinion was not clearly erroneous.

The Bents further contend that we should decline to apply the law of the case doctrine because our 2014 opinion was clearly erroneous. But the Bents' arguments regarding why our 2014 is erroneous mirror the arguments they raised—and we addressed and rejected—in our first opinion. The Bents do not raise any new arguments to support their claim that our resolution of these three issues was clearly erroneous.

In short, the trial court's order is contrary to the law of the case because the three reasons that it gives to support its 2016 new trial order are foreclosed by our 2014 opinion, which is the law of the case.

Accordingly, we hold that the trial court abused its discretion in granting the Bents' 2016 motion for new trial. *See In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d at 382 (trial court clearly abuses its discretion if it reaches decision that amounts to clear and prejudicial error of law or clearly fails to analyze law correctly or apply law correctly to facts).

### Conclusion

We conditionally grant USAA's petition for writ of mandamus. We order the trial court to vacate its order granting the Bents' motion for new trial and enter judgment on the jury's verdict. We are confident that the trial court will comply, and the writ will issue only if it does not.